## MARGARET M. GREENLEE, Respondent, v. KANSAS CITY CASUALTY COMPANY, Appellant.

### Kansas City Court of Appeals, January 17, 1916.

1. **ACCIDENT INSURANCE: Construction of Policy: Death from Bodily Injuries Caused Solely, Directly and Independently of all Other Causes by Accidental Means.** The language of a policy construed and *held* not to create a limited liability for the accidental death of insured. That is to say, the policy does not mean that even though insured suffered an accidental fall which brought on or caused a disease which in turn resulted in his death, the defendant is not liable.

2. ————: ————: ————: **Accidental Fall: Evidence.** The evidence in a case is reviewed and *held* to be sufficient to authorize the submission of the question of an accidental fall to the jury.

3. ————: **Evidence: Declaration: Res Gestae.** Insured, a large man weighing 200 pounds, in apparent good health and normal in manner, conduct and appearance, arose from his bed about three a. m. and went to the bath room thirty feet away. The instant he reached there his wife heard a fall and groan. She rushed to the bath room and finding her husband on the floor bleeding profusely from a cut on his head, exclaimed "What's the matter" and the husband replied "I slipped and fell." *Held*, admissible as a part of the res gestae and not the mere narration of a past transaction.

4. ————: ————: ————: **Confidential Communications Between Husband and Wife.** Since the statement "I slipped and fell" was a part of the *res gestae*, it cannot be considered as a confidential communication from husband to wife. Nor can such objection to its admissibility be made for the first time in the appellate court. If that ground of objection was not made in the trial court, it will not be available on appeal.

5. ————: **Accidental Death: Jury Question: Sufficiency of Evidence.** Evidence of case analyzed and *held* sufficient to make a case for the jury on question of accidental fall resulting in death.

6. ————: ————: ————: ————. Where plaintiff has made a prima-facie case and whether that prima facie case has been overthrown depends upon the weight to be given the oral testimony of defendant's witnesses, the case is one for the determination of the jury, since it is their province to say which witnesses shall be believed.

7. ————: ————: ————: ————: Contrary to Natural Law. If witnesses testify to matters directly contrary to well known and clearly established laws of nature a court may, as matter of law, disregard such testimony as unworthy of belief. But that can have no application in a case where the defense rests upon highly scientific theories which have not yet met the full approval of all scientific men.

Appeal from Jackson Circuit Court.—*Hon. Harris Robinson,* Judge.

AFFIRMED.

*McCune, Harding, Brown & Murphy* for appellant.

*Boyle & Howell* and *Jos. S. Brooks* for respondent.

TRIMBLE, J.—Plaintiff, as the beneficiary in an accident insurance policy held by her deceased husband, sued to recover the indemnity therein agreed to be paid in the event of insured's death by accidental means. She obtained judgment, and the defendant has appealed.

The policy insured ''against the effects of bodily injuries, caused directly, solely and independently of all other causes by accidental means, which bodily injuries or their effects shall not be caused wholly or in part, directly or indirectly by any disease, defect or infirmity.''

The answer set up the defense that the insured did not die from bodily injuries caused directly, solely and independently of all other causes by accidental means, but that his death was caused wholly or in part directly or indirectly by disease. The controversy, therefore, involves not only whether the insured's death was caused by an accident but also the meaning of the policy as to the extent of the liability created by it. Plaintiff claims that about three o'clock in the morning of April 12, 1912, the insured accidently slipped and fell in the bathroom of his residence striking his head on the sharp corner of the marble wash basin and that he

thereafter died from the direct results and effects of said accidental injury. Defendant's position may be stated thus: First. That insured's fall was not an accident but was the result of epidemic cerebro-spinal meningitis then attacking him and that he died from the effects of said disease. Second. That even if the fall was purely an accident, insured did not die as a result of the fall but from an attack of meningitis. Third. That even though the fall was purely accidental and even though the fall was the inducing or predisposing cause of the meningitis nevertheless, as the insured died of the disease and not solely from the effects of the fall or independently of the disease, still plaintiff could not recover for the reason that the policy by its terms did not create a liability extending that far.

The insured was forty-three years of age, a practicing dentist of some twenty years standing, and, at the time of his death, had his office in the business section of Kansas City and his home in a residence district thereof. On the morning of the 11th of April, the day preceding the night of his fall, he ate breakfast with his family and left home for his office at the usual time and was in his usual good health. He was engaged all day in his profession at his office, and during the day talked to his wife over the telephone. He came home at the usual hour, about 6 o'clock in the evening, and was in good health, cheerful in disposition, strong, vigorous, and perfectly normal in manner and appearance. About nine-thirty or ten o'clock that night he went to bed as usual. He and plaintiff occupied the same bed and he slept well without being nervous or restless. About three in the morning he got out of bed and went to the bathroom, a distance of about twenty-five or thirty feet. His wife spoke to him and he answered and said he was going to the bathroom but, upon objection by the defendant that this answer was "incompetent, irrelevant and immaterial" it was

192MA20

stricken out. There was· a light in the hall leading to the bathroom, and as her husband passed into the hall on his way thither, plaintiff glanced at her husband. He was perfectly normal in appearance, conduct and walk. Plaintiff noticed nothing in him unusual or different from that of other occasions, for he sometimes got up· at night and went to the toilet. In about the time it would take him to reach the bathroom, plaintiff heard a heavy fall and a moan from her husband. He was a large man weighing over two hundred pounds. The wife instantly sprang out of bed and ran to the bathroom. Her husband was lying on the floor with his head near the corner of the marble basin. He was bleeding profusely from a wound on his head and his night clothes around his shoulders were saturated with blood. He did not get up but lay there moaning and groaning. On reaching the bathroom plaintiff exclaimed ''What's the matter?'' and her husband said ''I slipped and fell.'' The floor of the bathroom was covered with linoleum and on this was a short rug in front of the basin and just inside the bathroom door. This rug was in its usual and proper position when Mrs. Greenlee retired that night but when she found her husband on the floor the rug was pushed to one side and crumpled, and there was water on the floor. On the corner of the basin was some blood and a few strands of hair. A nickel plated rack on which towels were hung, and which was fastened to the wall and in its proper position when they retired in the evening, was partly pulled down and twisted.

The insured's mother and brother, who was a physician, also lived in the house and they heard the fall and reached the bathroom almost immediately after his wife did.

Insured was unable to rise and they picked him up and put him to bed. He was still bleeding from a wound about an inch or an inch and a half long located above and a little to the back of the left ear. He appeared to be

dazed and was suffering great pain in his head and moaning. His brother washed and dressed his wound and administered a hypodermic injection of morphine to alleviate the pain. About an hour or possibly longer after his fall, insured had a spasm or convulsion consisting of a more or less contraction or twitching of the muscles and of the skin, lasting not more than a minute if that long. In half an hour after he was placed in bed he lapsed into unconsciousness, but whether this was or was not the effects of the morphine injection is not shown. At times thereafter he seemed to be conscious but afterwards again became unconscious, and during the periods of apparent consciousness was unable to talk rationally or coherently. When morning came he was resting quietly. He remained in bed throughout the day of the 12th in very much the same condition as above described except that he did not rest quietly but suffered pain. On the morning of the 13th he seemed to be resting but later in the forenoon of that day he grew much worse. His brother was sent for and on the way home he called Dr. Tesson and after the two arrived, the insured had another convulsion, consisting of a twitching and contracting of the muscles and possibly a drawing up of the limbs, which passed away in a very short time. He was unconscious and the physicians decided to remove him at once to the hospital. They placed him in an automobile and started. On the way thither, the insured, who was seated between the two physicians, was attacked by a third convulsion in which he suddenly straightened himself out and died. This occurred about one-thirty p. m. of the 13th. His death, therefore, resulted in a little less than thirty-six hours after his fall.

Defendant's demurrer to the evidence, which it now insists should have been sustained, raises the question whether plaintiff made a sufficient case to go to the jury. That is, was there evidence tending to show that the insured's fall was accidental and that his death

resulted therefrom. Before considering this question, however, it is necessary to pass upon the objections to some of the evidence offered by plaintiff to show that the fall was an accident.

It is insisted that the insured's statement, "I slipped and fell," made in response to his wife's exclamation, "What's the matter?" was not a part of the *res gestae* and was therefore inadmissible. We are of the opinion that it was a part of the *res gestae*. The declaration of the deceased was practically coincident in point of time with the main fact to be proved. Mrs. Greenlee heard the fall and reached her husband in the momentary interval it took to leap from her bed and run the short distance to the bathroom. Seeing husband upon the floor with blood streaming from a wound in his head, she exclaimed, "What's the matter?" and he replies, "I slipped and fell." Everything that transpired formed one continuous transaction, and the insured's statement was a part thereof. It was so nearly contemporaneous with the main fact under consideration, and was so clearly connected with it, that in the ordinary course of affairs it could be said to be the spontaneous exclamation of the real cause and was a verbal act constituting a part of, and illustrating, said main fact. It, therefore, meets the tests laid down by the authorities as necessary to bring it within the *res gestae*. [1 Greenleaf on Ev. (16 Ed.), sec. 108; 2 Taylor on Ev. (9 Ed.), sec. 588; Leahey v. Fair Grounds Railway Co., 97 Mo. 165, l. c. 172; Lund v. Inhabitants of Tyngsborough, 9 Cush. 36, l. c. 42; Insurance Co. v. Mosley, 8 Wall. 397; Harriman v. Stowe, 57 Mo. 93; Entwhistle v. Feighner, 60 Mo. 214.] Nor does the fact that insured's wife exclaimed "what's the matter" deprive the statement of its spontaneity or make it a mere narrative of a past transaction. The heavy fall, the rush of the wife to the bathroom, the sight of her bleeding husband upon the floor, the exclamation of the wife and the statement of the husband in explanation of

his situation are all so intimately connected and so natural and made under the nervous excitement and stress of the moment as to wholly differentiate it from those instances where, after the lapse of time, there has been opportunity for the mind to reflect and contrive, and the statement is a mere narrative of the circumstances of a past transaction given in answer to a cool and collected inquiry as to the nature thereof. The circumstances of sudden surprise, startling shock, and nervous excitement, coupled with the lack of time to contrive and misrepresent, entirely exclude the idea that the statement was not a perfectly natural and spontaneous expression. [3 Wigmore on Ev., sec. 1750.] The fact that the deceased appeared to be dazed does not destroy its evidentiary character. He was not irrational at that moment, nor did he become unconscious till afterwards. The fact that he was somewhat dazed affords rather an additional reason for thinking it was a natural expression and not the result of reflection and fabrication.

But it is insisted that the statement was a confidential communication from husband to wife. It would seem that it could not be regarded as a confidential communication for that would imply that it was a mere narrative of a past transaction. But since it was not such, but, as we have seen, was in the nature of a verbal act, connected with and explaining the situation, then it would seem the wife would be as competent to testify to that fact as to any other fact going to make up the transaction. It is unnecessary, however, for us to go into or decide the question whether the plaintiff was incompetent to testify to it on the ground that she was his wife, because no such objection to the evidence was made on that ground. We have carefully read the record and examined every objection made to the evidence of plaintiff and nowhere was the objection placed on such ground. The defendant, therefore, cannot claim any benefit by reason of such objection here.

These objections to plaintiff's evidence being disposed of, we now return to the question whether the evidence was sufficient to take plaintiff's case to the jury.

In addition to the evidence hereinbefore detailed, Dr. Snyder, a physician of thirteen years experience, testified that he was present at the autopsy held on the body of deceased and found a bruised and torn wound on the left side of the head just above and a little back of the ear; that the peri-cranium or covering over the external surface of the skull, which is a membrane nourished by blood vessels, was bruised and discolored in the vicinity of the wound and immediately under the bruised and lacerated portion. The wound was over one of the thinnest portions of the skull except the temple, and was over a suture, which is the line of articulation between the edges of two portions of the skull. On the inside of the skull, right under where the bruised tissue was, there was more or less fluid, and more contusion than on the outside, which indicated traumatism. In answer to a hypothetical question propounded to him, embracing the facts as presented by plaintiff's evidence and including certain facts suggested by counsel for defendant, the physcian gave it as his opinion that the fall and the injuries resulting therefrom could and might have caused the death. He also testified that the brain could be injured by a fall or blow on the head without a fracture of the skull bone.

This evidence, taken in connection with the facts hereinbefore stated and with the evidence showing that insured was in normal health prior and up to the very moment of his fall, amply tended to show that deceased sustained an accidental fall and died as a direct result thereof. Indeed, the fact that insured met with an accidental death would not and could not be questioned were it not for the evidence of defendant's expert witnesses who testified that at the autopsy they found

that deceased was suffering at the time of his death
with meningitis, and, upon making a microscopical ex-
amination, discovered the presence of a germ showing
that the particular kind of meningitis was epidemic cer-
ebro-spinal meningitis. (It seems that meningitis is a
general term which may, in this instance, be defined as
an inflammation of the meninges or enveloping mem-
branes of the brain, while epidemic cerebro-spinal men-
ingitis is that particular kind or form of meningitis
which is an acute, infectious disease caused by a mi-
crobe, *Diplococus intracellularis*.) Defendant's experts
say insured died of this form of meningitis, and, as
there was an epidemic of that disease in Kansas City
shortly before and extending into April, 1912, defend-
ant's theory is that the fall in the bathroom was the re-
sult of the onslaught of the disease and was not an ac-
cident. In other words, that insured contracted epidemic
cerebro-spinal meningitis and died therefrom and the
fall in the bathroom was a mere incident manifesting
the presence of the disease, and hence the disease and
not the fall caused his death. Defendant says that the
undisputed testimony is that deceased died from this
particular form of meningitis. But, as we have seen,
plaintiff's evidence was sufficient to authorize the
jury to find that insured's fall was purely an accident
and that his death resulted directly from that fall. The
evidence in plaintiff's behalf does not admit that in-
sured was suffering from meningitis when he died but
presents a state of facts from which the jury could find
that he died from the effects of the fall itself and did
not suffer from meningitis of any kind. We do not
understand that plaintiff's case was tried on the theory
that meningitis was conceded. The case was tried on
the theory that the fall itself was sufficient to and did
produce death without the intervention of any other
cause. Plaintiff's counsel did follow defendant into
the question of meningitis but this, we understand, was
only meeting defendant upon its own ground. In do-

ing so, plaintiff's theory was that even if the jury should find that insured at the time he died was suffering with a meningitis, i. e., an inflammation of the brain membranes, or even with epidemic cerebro-spinal meningitis as claimed by defendant, still plaintiff was not precluded from recovery if the fall was purely accidental and the meningitis, of whatever kind, arose as a direct result of the fall and his death was caused thereby. There was evidence that some forms of meningitis may be caused by a blow on the head and if insured was suffering at the time he died with any of those forms of meningitis, there was still room (so far as the evidence was concerned and without regard to the construction to be placed on the words of the policy), for the jury to find that insured fell accidentally and that his death resulted directly from the fall. Even if insured was, at the time he died, suffering with epidemic cerebro-spinal meningitis as claimed by defendant, this did not *conclusively* destroy plaintiff's right to recover. (We are dealing now with the evidence and not with any construction to be placed on the policy.) There was evidence to the effect that a man can become infected with the germ of this disease from a cut or wound; that when the germ gets into the body it makes its way to the meninges of the brain and there attacks them; that if the germs are introduced directly into the blood stream they can reach their objective and produce their effects much more rapidly; that a blow on the head by lowering the vitality renders one more susceptible to the disease and less able to throw off the germs; that a man can be infected with the germ from an injury to the skin; that where the germ is introduced into the circulation direct it could produce evidences of the activity of the disease within one or two hours. The evidence of defendant's experts was to the effect that after the germ enters the body it requires a certain time called the period of incubation to elapse before the germs have multiplied sufficiently

to manifest the disease and that in insured's case this period of incubation necessarily extended back past the time of the fall and, therefore, the insured had the disease at that time and his fall was merely the symptom or manifestation of the disease. But, their evidence also shows that this period of incubation varies from twenty-four hours to thirty-two days according to the virulence of the germs and the resisting power of the victim. And it is not conclusively shown when the symptoms of the disease first manifested themselves in the deceased. The presence of epidemic cerebro-spinal meningitis was not disclosed until the autopsy was made. It is true the insured had several convulsions, but there was evidence that the first one was what might be expected from a man suffering from a blow on the head, and while he thereafter had some of the symptoms of meningitis they were also the symptoms which result from a serious injury to the brain by a blow. In short, there was evidence tending to show that the insured accidentally fell and it alone was sufficient to cause death, but that even if he had cerebro-spinal meningitis when he died, it could have been caused by or resulted from the fall. Under all these circumstances, it was for the jury to say whether the fall was purely accidental and of itself alone resulted in death, or whether an accidental fall caused or brought on a disease resulting in death. The plaintiff having made a prima-facie case covering both of these questions, the burden was on defendant to show that the death did not result from an accident.

But defendant takes the position that since its experts gave it as their opinion that a person cannot be infected with the germ of epidemic cerebro-spinal meningitis through a wound, the plaintiff's prima-facie case is overthrown. The logical result of this position is to say that plaintiff's evidence to the contrary is not worthy of belief. But as to what witnesses will be believed is for the jury to say. Of course if plaintiff's

witnesses testified to matters directly contrary to well known and clearly established laws of nature, then the court might say as a matter of law, that their testimony should be disregarded. But the controversy herein is not over well known and fully attested physical facts. The evidence clearly shows that the defense rests upon highly scientific theories which have not yet met the full approval of all scientific men. It shows that the means by which the germ of meningitis may enter the body is still shrouded in mystery. The greater trend of opinion is that they enter through the nose and throat but this is only mere opinion. Three experts for the defense testified they could enter through an abrasion of the skin. For this court to reverse the case on the ground that the evidence is insufficient, is to decide as matter of law the very thing about which scientists differ and concerning which it is admitted mankind has not yet attained a full and complete knowledge. In such situation the authorities all hold that the question of fact at issue must be left to the jury. [Fetter v. Fidelity and Casualty Co., 174 Mo. 256, l. c. 266; Beile v. Travelers Protective Assn., 155 Mo. App. 629, l. c. 614; Driskell v. United States etc. Ins. Co., 117 Mo. App. 362; Whiteaker v. Chicago, etc. R. Co., 252 Mo. 438, l. c. 452.]

In passing on this question of the demurrer to plaintiff's evidence we have purposely left out of consideration, until now, defendant's contention that the policy should be so construed as to create only a limited liability for the accidental death of insured. That is, that the policy means that even though insured's fall was purely accidental and that the fall caused or brought on a meningitis which in turn caused his death, nevertheless plaintiff could not recover. But even this construction would not justify the sustaining of a demurrer to the evidence, since, as we have hereinbefore shown, there was evidence from which the jury could

find that the fall was purely accidental and that the fall alone produced the insured's death.

However, defendant's construction of a limited liability must be considered because, if that construction is correct, then defendant was entitled to have that construction applied to the facts by appropriate instructions; and this brings us to the complaint of defendant concerning the court's action in regard thereto.

The defendant asked two instructions numbered 4 and 5 which, as asked, included defendant's construction of the contract, namely, that plaintiff was not entitled to recover if deceased died of meningitis even though the fall was the producing cause of the meningitis and that fall was accidental. The court, however, by modification eliminated this idea from the instructions. The two instructions, as asked, were as follows:

4. "The court instructs the jury that even though you may believe from the evidence that the fall of Robert P. Greenlee was caused by accidental means alone, still if you believe that his death was caused in whole or in part, directly *or indirectly,* by epidemic cerebrospinal meningitis, your verdict must be for the defendant."

5. "The court instructs the jury that if you believe from the evidence in this case that the death of Robert P. Greenlee was caused in whole or in part, directly *or indirectly* by epidemic cerebro-spinal meningitis, your verdict must be for the defendant."

The modification consisted in striking out the words "or indirectly" and the instructions were then given as modified.

To correctly understand the propriety of this modification it is perhaps necessary to state the substance of the instructions that were given. The first one for plaintiff told the jury that if they believed and found from the evidence that insured accidentally fell and was injured on the head, "and that from the effects of

such accidental injury the said Robert P. Greenlee did thereafter on the 13th day of April, 1912, die, as the direct result and effect of said injury" then their verdict should be for plaintiff. The next instruction was to the effect that if the jury believed from the evidence that said fall was the sole, direct and independent cause of insured's death "and that said deceased would not have died at the time, under the circumstances and in the manner he did die if he had not experienced said fall and if said fall was not in any way produced or caused by meningitis, then your verdict must be for the plaintiff and the burden of proving this rests upon said plaintiff and if she fails to prove by the greater weight of all the credible evidence in the case that death did so and in such manner result then your verdict must be for the defendant."

On behalf of defendant the court in instruction No. 1 told the jury that:

"If you believe from the evidence that the fall of Robert P. Greenlee was caused by vertigo, dizziness or convulsion, resulting from epidemic cerebro-spinal meningitis, your verdict must be for defendant."

In No. 3 the jury were told that:

"The burden is on plaintiff to prove that the injury to and the death of Robert P. Greenlee were both directly caused by accidental means alone, independently of all other causes and unless plaintiff has established by a preponderance or greater weight of the credible testimony that both the injury to and the death of Robert P. Greenlee were directly caused by accidental means alone, independently of all other causes, your verdict must be for defendant."

Instructions numbered 4 and 5 were given as hereinbefore set out except that they were modified by striking out the words "or indirectly" in each of them.

In instruction No. 6 the jury were told that:

"Even though you may believe from the evidence that the fall of Robert P. Greenlee was caused by acci-

dental means alone, still before you can find for the plaintiff, you must believe from the evidence that the fall was the direct and proximate cause of the death of said Robert P. Greenlee.''

It will be seen, therefore, that the only effect of the modification of instructions Nos. 4 and 5 by striking out the words ''or indirectly'' was to take away the idea that plaintiff could not recover even if the jury found that the meningitis, claimed to have been the cause of his death, was produced by the injury he received in his accidental fall. This presents, therefore, the question whether such construction of the contract insisted upon by defendant is correct. In other words, does the policy, when rightly construed, mean that the liability does not extend to nor include the results of disease contracted by and through, or caused by, an accidental physical injury?

Unless the language of the policy is so plain and explicit as to afford no room for construction, it should, if possible, be construed most favorably to the insured and against the insurer. In 4 Cooley's Briefs on the Law of Insurance, page 3200 it is said:

''If a disease resulting in death is the effect of an accident, so as to be a mere link in the chain of causation between the accident and the death, the death is attributable, not to the disease, but to the accident alone.''

We are of the opinion that the construction contended for by defendant is not correct. We do not think the qualifying words in this policy are in reality any greater than those in the case of Fetter v. Fidelity and Casualty Co., 174 Mo. 256 or in Beile v. Travelers Protective Association, 155 Mo. App. 629. And in those cases the construction contended for here was denied. The case of Goodes v. Order of United Commercial Travelers, 174 Mo. App. 330, is a case very much like the one at bar both on the facts and on the construction to be placed on the contract. There, the policy said the

liability did not extend to "any death, disability. . . happening directly or indirectly in consequence of disease or caused wholly or in part by bodily infirmities or disease." These words of limitation are fully as broad and comprehensive as the limiting words of the policy in the case at bar, and yet the construction contended for was not adopted. [See, also, the following cases: Driskell v. United States etc. Accident Ins. Co., 117 Mo. App. 362; Delaney v. Modern Accident Club, 63 L. R. A. 603; National Benefit Assn. v. Grauman, 107 Ind. 288; Isitt v. Railway Passengers Assn., L. R. 22 Q. B. 504].

In the case of Carr v. Pacific Mut. Life Ins. Co., 100 Mo. App. 602, cited by defendant, the injury was held to be the direct result of the sickness. The insured was in bed in a hospital unconscious from fever and had to be restrained at times from doing violence to himself. His nurse left the room for a moment and when she returned he had gone through the window to the ground. There was no evidence of accident in the case. Besides, the Fetter case is superior in authority to it if it announces a different rule.

Complaint is also made of the refusal of defendant's instructions 7 and 9. They were, however, properly refused for the reason that they told the jury to find for defendant even if they found insured accidentally fell and through his fall contracted meningitis and died therefrom. The authorities are to the effect that where an accident causes a disease, which disease in turn results in death, the accident is, in law, the proximate cause of the death and not the disease. Therefore, if the jury found that the accidental fall caused the disease and the disease produced death, the jury could not change a matter of law and find as a fact that, under such circumstances, the disease was the "efficient, predominant and proximate cause of death."

Under the instructions which were given, all the issues were fairly submitted to the jury. Before the

jury could find for plaintiff, they were required to find that the fall was not in any way produced or caused by meningitis. The instructions also submitted to the jury the questions whether the insured died from the effects of an accidental injury; whether that accidental injury was the sole, direct and independent cause of his death and whether he would have died had he not received such fall.

We think the case was fairly tried and that we are without authority to disturb the verdict.

The judgment is, therefore, affirmed. All concur.