SULLIVAN, Respondent, v. METROPOLITAN LIFE IN-
SURANCE CO., Appellant.

(No. 7,169.)

(Submitted February 1, 1934.   Decided February 23, 1934.)

[29 Pac. (2d) 1046.]

*Mr. Charles R. Leonard* and *Mr. W. D. Kyle,* for Appellant, submitted a brief and argued the cause orally.

256

*Mr. H. Lowndes Maury* and *Mr. A. G. Shone,* for Respondent, submitted a brief; *Mr. Shone* argued the cause orally.

MR. JUSTICE ANDERSON delivered the opinion of the court.

This action was brought to recover on what is equivalent to a double indemnity provision of three life insurance policies by plaintiff, the beneficiary named therein.

James J. Sullivan at the time of his death on July 19, 1932, was the insured in these policies, dated, respectively, October 4, 1920, May 19, 1924, and March 17, 1930; the amount of the insurance on these policies was, respectively, $444, $168 and $240. The face amount of each of these policies was paid subsequent to his death and before the commencement of this action.

The defendant company, on January 2, 1929, by voluntary announcement in writing, gave the insured under these policies certain additional beneficial provisions, which writing became part of each of the policies in question. The pertinent portions thereof are as follows: ''Upon receipt of due proof that the insured, after attaining the age of 15 and prior to attaining the age of 70, has sustained, after the date of this policy, bodily injuries, solely through external, violent and accidental means, resulting, directly and independently of all other causes, in the death of the insured within ninety days from the date of the bodily injuries, * * * the company will pay in addition to any other sums due under this policy and subject to the provisions of this policy an accidental death benefit equal to the face amount of insurance then payable at death, except that if such bodily injuries are sustained by the insured while employed in or on the premises of any open pit or underground mine * * * shall be only one-half of the face amount of insurance then payable at death. * * * No accidental death benefit will be paid if the death of the insured is the result of self-destruction, whether sane or insane, nor if death is caused or contributed to, directly or indirectly, or wholly or partially, by disease, or by bodily or mental infirmity.''

The insured was employed as a watchman for a number of years by the Anaconda Copper Mining Company, on the Modoc Extension mining claim, on which were located precipitating tanks and other surface improvements. Underground mining operations were engaged in on the particular claim, but there was no pit or shaft on the claim where the insured was employed connecting with the underground workings. The mining operations on the claim were conducted from a shaft or shafts located on other properties of the mining company. The workings on the claim in question were reached by underground tunnels and drifts from other mining claims.

On June 14, 1932, the insured was to report for duty at 10 o'clock P. M. During the evening preceding he was assisting his son and friends of the latter in the construction of a tennis court near their homes, performing manual labor. At this time the insured was sixty-four years of age. The evidence is in dispute as to whether his health prior to that date had been good. However, he had not required medical attention. It appears that on this evening shortly before 10 o'clock the insured left home in company with his son and his two friends who were desirous of securing some pipe to be used as posts for the supports of a tennis net on the court then under construction and lime to be used in the preparation of the same. It was thought these materials could be obtained on the claim where the insured was performing the duties of watchman. These parties left the home of the insured and stopped at the gateway to the Leonard mine, where the father left the automobile, as it was necessary for him to report at this mine for duty, it being contemplated that he would walk across the inclosure of the Leonard mine and meet his son and companions at the precipitating tanks, or near there, located on the Modoc Extension claim. The other occupants of the automobile proceeded over a different route from that pursued by the father to reach the precipitating tanks, consuming, as was testified, about five minutes in this operation. On arriving at the appointed place, they left the automobile some little distance from the tanks and proceeded to enter what is de-

scribed as a "shack," to await the coming of the insured. To reach this point the insured had to travel a distance of 1,700 feet; over this route the elevation increased 150 feet. The son remained in the "shack," as testified to by him on direct examination, not over ten minutes, and on cross-examination he said he remained there for about two minutes. Thereupon he left the "shack" and found his father lying on top of a piece of sheet metal, which was described as resting one end on the ground and the other end on a railroad track or ties about ten inches above the ground. This piece of sheet metal was testified to as having been of the following dimensions: Four and one-half feet long, one-half foot wide and one-half inch thick. The insured, when found, was lying face downward and attempting to arise. The son turned him over. He was permitted to testify over objection that his father said, immediately thereafter, "I fell." The son further testified that he then ran about 25 feet and called to his companions in the "shack," about 75 feet from where the insured lay, for assistance, ran back to his father who, he testified, over objection, immediately said: "I fell over this piece of sheet-iron, I didn't see it." The two boys in the party with the son of the insured answered the call and assisted in placing the insured upon a platform in close proximity to the "shack"; they thereupon left the father and son together and proceeded for the automobile, and, in order to bring the automobile to the platform, some five minutes of time were consumed. During this interval, as testified to by the son, his father was sitting on the platform with his feet hanging toward the ground, and while sitting there he fell forward into his son's arms, and he let the father down onto the ground. About this time one Clyde Lucas and two other men passing by assisted in removing the insured into the "shack." After the departure of Lucas and his companions, the boys returned with the car, and the insured was removed to his home in the automobile. Dr. Person was called that night and found that the insured was suffering from a cerebral hemorrhage. Dr. Torkelson was

called the day following and examined the insured. The insured died on June 19, 1932, from a cerebral hemorrhage.

It was the theory of the plaintiff on the trial of the case that the insured fell over the sheet metal, causing the cerebral hemorrhage. Dr. Torkelson testified that in his opinion the fall caused the hemorrhage, for the reason that the insured was not immediately rendered unconscious at the time he was found by his son, and expressed the belief that, had the hemorrhage preceded the fall, the rupture of the blood vessel in the brain of the insured would have been increased by the fall so as to render him immediately unconscious.

Dr. Person testified on behalf of the defendant, and expressed the opinion that the hemorrhage preceded the fall, and assigned as the principal reason for his conclusion that such hemorrhages usually occurred in such manner. He further testified that at the time of his examination the insured was suffering from high blood pressure which would have been higher before the rupture of the blood vessel occurred. It was generally conceded by the medical witnesses that the insured was suffering at that time from arteriosclerosis or hardening of the arteries. No autopsy was performed.

The trial of the case resulted in a verdict for plaintiff for the face amount of the policies. Judgment was entered accordingly. The appeal is from the judgment.

The defendant demurred generally to the complaint, which demurrer was overruled, and objection was made to the sufficiency of the complaint at the outset of the trial upon the ground that it did not state facts sufficient to constitute a cause of action, which objection was overruled. Defendant has assigned these rulings as error. It contends that, the plaintiff having failed to negative the exception, namely, that, as provided by the policies, if the insured was employed in or on the premises of any open pit or underground mine, then the accidental benefit would be reduced one-half, the complaint was insufficient. The complaint did not negative this exception. Under it, if it applied, the defendant company was not

relieved from all liability for accidental death, but its liability was reduced by one-half.

The rule is that the allegations of a complaint are sufficient as to substance if a cause of action is stated therein upon any theory. (*Reed* v. *Woodmen of the World*, 94 Mont. 374, 22 Pac. (2d) 819, and cases there cited.) If the plaintiff had, instead of negativing the exception, by appropriate allegation disclosed on the face of her complaint the fact that at the time alleged the insured was employed in or on the premises of an underground mine, the amount she might recover would be thereby reduced one-half, but nevertheless the complaint would state a cause of action, though for the lesser amount.

The general rule in actions on accident insurance policies is that the person seeking to recover need not allege that the death or injury of the insured did not result from any of the causes which by the terms of the policy would relieve the insurer from liability thereunder. The fact that the death or injury resulted from such cause is a matter of affirmative defense and must be alleged by the insurer in its answer. (*Starr* v. *Aetna Life Ins. Co.*, 41 Wash. 199, 83 Pac. 113, 4 L. R. A. (n. s.) 636; Couch on Insurance, p. 6832. Compare *Commonwealth Public Service Co.* v. *City of Deer Lodge,* ante, p. 15, 28 Pac. (2d) 472.)

Obviously, the above contention is without merit.

The court, over objection, permitted Sullivan, Jr., to testify as to the statements made by his father above recited. Counsel for the defendant objected to the admission of these statements on the ground that they were hearsay and no part of the *res gestae.* Admittedly the only theory upon which this testimony could be admitted was that the statements were a part of the *res gestae.* Error is specified on the admission of this testimony.

"*Res gestae* are the circumstances, facts and declarations which grow out of the main fact, are contemporaneous with it, and serve to illustrate its character." (*State* v. *Broadwater,* 75 Mont. 350, 243 Pac. 587, 589.) Declarations made while the mind of the speaker is laboring under the excite-

ment aroused by the accident, before there was time to reflect and fabricate, are admissible. Such statements need not be entirely contemporaneous with the main incident; they may be in the form of narrative. Yet, if circumstances show they were made while the excitement produced by the incident still dominated the mind and was a producing cause, they are nevertheless part of the main event and competent. On the contrary, if they are in fact mere narrative, they are not competent. (*Callahan* v. *Chicago, B. & Q. R. R. Co.*, 47 Mont. 401, 133 Pac. 687, 47 L. R. A. (n. s.) 587.) Whenever a question of fact arises upon conflicting evidence as to whether declarations are a part of the *res gestae* or depends upon contradictory inferences, either of which may fairly be drawn from such evidence, the solution of the question of admissibility of the evidence must in every case be left largely to the sound legal discretion of the trial court, subject to review only in case of manifest abuse. (*Callahan Case*, supra.)

There is no direct evidence as to the length of time between the fall of the insured and the making of the declarations in question. If we assume that the insured proceeded, after leaving the automobile, at the rate of three miles per hour, approximately six minutes would have been consumed by him in reaching the point where he fell; and, if his son was correct in stating on cross-examination that he remained in the "shack" only two minutes, then he reached his father in seven or eight minutes after he last saw him; or, if the time he remained in the "shack" was more nearly as testified to on direct examination, then nearly fifteen minutes elapsed between the time he left his father at the gate of the Leonard mine and when he found him. If the insured proceeded at the rate of two miles an hour, approximately ten minutes would have been consumed by him in going from the gate of the mine to the place where he fell. Hence the statements were made at any time from one to nine minutes following the fall.

Cases from other jurisdictions are not in accord as to the admissibility of similar declarations, and may be divided into three classes: (1) Where the statements are made contempo-

raneously with the accident; (2') where it appears that they were uttered after the lapse of so brief an interval and in such connection with the principal transaction as to form a legitimate part of it; (3) where, under the facts and circumstances, it appeared that they had been made at a more remote time but without sufficient lapse of time to permit of fabrication. (*Murray* v. *Railroad,* 72 N. H. 32, 54 Atl. 289, 101 Am. St. Rep. 660, 61 L. R. A. 495.) This court has heretofore, as noted above in the case of *Callahan* v. *Chicago etc. R. R. Co.,* adopted the more liberal rule; hence authorities may be found in many jurisdictions which are not in accord with that decision. Statements similar to those made in the instant case have been held properly admissible. (*Greenlee* v. *Kansas City Casualty Co.,* 192 Mo. App. 303, 182 S. W. 138; *Murray* v. *Railroad,* supra.)

The element of time elapsing after the accident and before ▉▉ the utterance sought to be proved is not decisive, but important. No precise rule has been, nor can be, formulated for determining what statements are a part of the *res gestae;* consequently, each case is in a sense a law unto itself and must be decided on its particular facts, so that precedents are valuable more for the purpose of illustration than for establishment of a rule which may be generally followed. (8 Couch on Insurance, p. 7122; *Denver & Rio Grande R. Co.* v. *Roller,* (C. C. A.) 100 Fed. 738, 49 L. R. A. 77; *Flannagan* v. *Provident Life & Acc. Ins. Co.,* (C. C. A.) 22 Fed. (2d) 136.)

In *Eby* v. *Travelers' Ins. Co.,* 258 Pa. 525, 102 Atl. 209, a declaration made from ten to fifteen minutes after the accident and as soon as the insured was able to speak was held properly admissible. A statement made from two to three minutes after the accident was held properly admitted in the case of *Meyer* v. *Travelers' Ins. Co.,* 130 Minn. 242, 153 N. W. 523. A statement made from two to three minutes after the accident, but not at the place of its occurrence, was held to be properly admissible in *Ellis* v. *Interstate B. & M. Assn.,* 183 Iowa, 1279, 168 N. W. 212, L. R. A. 1918F, 414. Declarations made from ten to thirty minutes after the accident were held inadmissible in the case of *Vicksburg & Meridian R. R. Co.* v. *O'Brien,* 119

U. S. 99, 7 Sup. Ct. 118, 30 L. Ed. 299. A statement made from thirty to forty minutes after the accident was held inadmissible in *International Travelers' Assn.* v. *Griffing,* (Tex. Civ. App.) 264 S. W. 263. A statement made from fifteen to thirty minutes after the accident was held inadmissible in the case of *Missouri State Life Ins. Co.* v. *Makiver,* (C. C. A.) 4 Fed. (2d) 185. A statement made a short time after the accident as the result of repeated questions was held to be properly excluded in the discretion of the court. (*Landau* v. *Travelers' Ins. Co.,* 305 Mo. 563, 267 S. W. 376.) Mr. Chief Justice Bleckley of the Georgia supreme court said: "What the law altogether distrusts is not after-speech, but afterthought." (*Travelers' Ins. Co.* v. *Sheppard,* 85 Ga. 751, 12 S. E. 18, 26.)

The statements made in this case by the insured were not in response to any inquiry, but apparently were his spontaneous declarations. The exact time intervening between his fall and the statements is not capable of determination from the testimony, although it does appear that it was not more remote than it was with reference to statements made in some of the illustrative cases holding such declarations admissible. We therefore conclude that we are unable to say, as a matter of law, that the trial court abused its sound judicial discretion in the admission of this testimony.

Defendant contends that error was committed by the trial court in denying its motion for a directed verdict and in refusing to give certain offered instructions which, under the facts, would have been equivalent to directing a verdict. This contention finds its basis in the following provision of the voluntary announcement which became a part of the insurance policies, the material portion of which is as follows: "No accidental death benefit will be paid if the death of the insured is * * * caused or contributed to directly or indirectly or wholly or partially, by disease or by bodily or mental infirmity."

It is conceded by Dr. Torkelson, the witness who testified most favorably to the plaintiff, that the insured "did have

270

some disease of the blood vessels such as sclerosis, which leaves the blood vessels more brittle. He evidently had a sclerosis. He had a high blood pressure of some sort, or a disease of the blood vessels that goes along with old age.'' We gather from the testimony of Dr. Torkelson that had a man falling under like conditions as is contended the insured fell, who was not suffering from a sclerosed condition, in all probability no hemorrhage would have resulted. It is conceded by all that the immediate cause of the death of the insured was a hemorrhage in his brain.

Plaintiff's theory of the case is that the fall caused a rupture of the blood vessels of the brain, and that, although these blood vessels were sclerosed, had the insured not fallen, his death would not have ensued. And it was testified that, had there been no fall, in all probability the insured might have lived for a number of years, although suffering from arteriosclerosis.

The theory of the defendant is that, had the plaintiff been free from this condition, even though he fell as testified to, death would not have resulted, and that therefore the sclerosed condition of the insured's arteries was a contributing cause of his death, and hence the defendant was not liable under the provisions of the policies above quoted.

It is not the province of courts to make contracts for parties sui juris, but rather to interpret and enforce them as made by the parties themselves in accordance with their terms, when legitimate and based upon a valid consideration. (*W. T. Rawleigh Co.* v. *Washburn,* 80 Mont. 308, 260 Pac. 1039; *Frank* v. *Butte & Boulder M. & L. Co.,* 48 Mont. 83, 135 Pac. 904; *Pearce* v. *Metropolitan Life Ins. Co.,* 57 Mont. 79, 186 Pac. 687; *State Bank of Darby* v. *Pew,* 59 Mont. 144, 195 Pac. 852; *Nielson* v. *Hendrickson,* 63 Mont. 518, 210 Pac. 905; *Emerson-Brantingham Implement Co.* v. *Raugstad,* 65 Mont. 297, 211 Pac. 305; *General Fire Extinguisher Co.* v. *Northwestern Auto Supply Co.,* 65 Mont. 371, 211 Pac. 308; *Fitzgerald* v. *Eisenhauer,* 62 Mont. 582, 206 Pac. 685; *Ebeling* v. *Bankers' Casualty Co.,* 61 Mont. 58, 201 Pac. 284, 22 A. L. R. 777.)

Some courts hold that the fact that the arteries of the insured ▮ were sclerotic will not bring death within an exception of liability for death resulting wholly or partially, directly or indirectly, from disease or bodily infirmity, if they were not more so than was natural to a man of his age, although a bodily injury would more likely be fatal than if his arteries were not sclerotic (*Lickleider* v. *Iowa etc. Assn.*, 184 Iowa, 434, 166 N. W. 363, 168 N. W. 884, 3 A. L. R. 1295; *Moon* v. *Order of United Commercial Travelers*, 96 Neb. 65, 146 N. W. 1037, Ann. Cas. 1916B, 222, 52 L. R. A. (n. s.) 1203; *Hooper* v. *Standard Life & Acc. Co.*, 166 Mo. App. 209, 148 S. W. 116), although under other decisions a sclerotic condition has been held to relieve the insurer of liability (*Commercial T. M. Acc. Assn.* v. *Fulton*, 24 C. C. A. 654, 79 Fed. 423; *Maryland Casualty Co.* v. *Morrow*, 213 Fed. 599, 130 C. C. A. 179, 52 L. R. A. (n. s.) 1213; *Binder* v. *National M. Acc. Assn.*, 127 Iowa, 25, 102 N. W. 190). None of these decisions gives consideration to the exact phraseology employed in the insurance contracts here in question, although the language employed is indeed similar.

It appears to us that the decisions on this question are in hopeless conflict, and that it would be a waste of time and energy to attempt to classify or analyze these and other cases (*United States Casualty Co.* v. *Thrush*, 21 Ohio App. 129, 152 N. E. 796, motion to certify record overruled by supreme court of Ohio), although an attempt was made to analyze and classify the decisions by the Wyoming supreme court in the case of *Equitable Life Assur. Soc.* v. *Gratiot*, 45 Wyo. 1, 14 Pac. (2d) 438, 82 A. L. R. 1397.

Some of the decisions taking divergent views on this question are readily distinguishable, but, after careful consideration, it appears any attempt to distinguish all of the conflicting decisions would result in judicial utterances so refined in character, with the line of demarcation so dim and indistinct, that the basis for a conclusion would be neither satisfactory nor convincing. Perhaps the best statement of the principle of law here applicable, in the light of the facts disclosed, was declared

by the supreme court of Massachusetts in the case of *Freeman* v. *Mercantile Mutual Acc. Assn.*, 156 Mass. 351, 30 N. E. 1013, 1014, 17 L. R. A. 753, which statement has received the approval of a large number of courts, wherein it was said: "Where different forces and conditions concur in producing a result, it is often difficult to determine which is properly to be considered the cause, and in dealing with such cases the maxim, *causa proxima, non remota, spectatur,* is applied. But this does not mean that the cause or condition which is nearest in time or space to the result is necessarily to be deemed the proximate cause. It means that the law will not go further back in the line of causation than to find the active, efficient, procuring cause, of which the event under consideration is a natural and probable consequence, in view of the existing circumstances and conditions. The law does not consider the cause or causes beyond seeking the efficient, predominant cause, which, following it no further than those consequences that might have been anticipated as not unlikely to result from it, has produced the effect. An injury which might naturally produce death in a person of a certain temperament or state of health is the cause of his death, if he dies by reason of it, even if he would not have died if his temperament or previous health had been different; and this is so, as well when death comes through the medium of a disease directly induced by the injury, as when the injury immediately interrupts the vital processes."

The cases which support the position of the plaintiff adopt the reasoning that to hold the insurance company by the issuance of a policy intended to adopt the view that the policy would not be valid where natural diseases, especially those incident to old age, makes serious results more probable from accidents, would be an unfair and unreasonable construction; that the insurance company intended a reasonable scope of insurance, and this can be accomplished by holding the company liable for accidents which operate upon the physical system according to the natural and usual conditions of age to pro-

duce death. (*United States Casualty Co.* v. *Thrush,* supra; and see *Moon* v. *Order of United Commercial Travelers,* supra.)

The Wyoming case upon which the plaintiff confidently relies (*Equitable Life Assur. Soc.* v. *Gratiot,* supra), in the last analysis reaches the conclusion attained largely upon the peculiar wording of the policy under consideration, as distinguished from the language employed in other cases reaching a contrary result. The provision here under consideration is different from that employed in cases there distinguished.

Under the particular policy provision here considered, if there is no active disease but merely a frail general condition, so that the powers of resistance are easily overcome, or merely a tendency to disease which is started up and made operative resulting in death, then there may be recovery, even though the accident would not have caused that effect upon a healthy person in a normal state. (*Leland* v. *United Travelers of America,* 233 Mass. 558, 124 N. E. 517; 5 Couch on Insurance, p. 4009.)

While it is true, as said in decisions supra, that a reasonable scope of insurance was contemplated, nevertheless by clear and unequivocal language it was likewise contemplated that the insured might suffer an accident resulting in death, to which disease or bodily infirmity contributed indirectly or partially; and, if so, such a death was within the exception.

It is contended that the insured was suffering from a disease or bodily infirmity which actively co-operated with the fall in causing death. The disease and fall were concurring, efficient and proximate causes in producing the death. Either alone, without the other, would not have resulted fatally. It cannot be held, with due regard to the meaning of the words in the contracts here sued upon, that the death of the insured resulted from the accident—that the death was not contributed to either directly or indirectly or partially by disease or by bodily infirmity. The disease was not aggravated into activity by the fall, but by reason of the sclerosed condition of the insured's arteries the fall caused the hemorrhage; hence that condition contributed to the resulting death.

274

The trial court was in error in denying defendant's motion for a directed verdict.

The cause is remanded to the district court of Silver Bow county, with direction to enter judgment of dismissal in favor of the defendant.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES ANGSTMAN, MATTHEWS and STEWART concur.

Rehearing denied March 3, 1934.