The STATE OF MONTANA, Plaintiff and Respondent, v. FRED MEDICINE BULL, JR., Defendant and Appellant.

No. 11482
Submitted Sept. 13, 1968.
Decided Oct. 18, 1968.
Rehearing Denied Nov. 6, 1968.
445 P.2d 916.

Robert Wilson (argued), Hardin, for appellant.

William F. Meisburger, County Atty., Forsyth, Forrest H. Anderson, Atty. Gen., Charles W. Joslyn, Asst. Atty. Gen.,

(argued), James R. Beck, Asst. Atty. Gen., (argued), Helena, for respondent.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

The appellant, Fred Medicine Bull, Jr., was charged by information of first degree murder. He was tried by jury and convicted of involuntary manslaughter. From this judgment he appeals.

On July 20, 1967, the appellant a 17 year old Northern Cheyenne Indian boy, was driving his father's 1956 Ford pickup truck. He was accompanied by the decedent, Geraldine Killsnight, age 19. The decedent, who was pregnant with appellant's child, was married to Fred Medicine Bull, Jr. shortly before in the "Indian Way." During their drive they saw Christopher White Hawk swimming, and stopped on a bridge to talk to him. It would appear the couple were drinking beer for White Hawk asked the appellant for a beer but was told that there was no more. White Hawk, age 19, then got in the pickup with the decedent and Medicine Bull and drove to Birney where they bought a case of beer. Just how two 19 years olds and a 17 year old could purchase beer, when the law prohibits sale to persons under 21, is not explained by the record.

They then started back to the Birney bridge where they first met White Hawk, stopping three times along the way. At one stop the decedent assumed the driving duties because she believed the appellant was driving too fast. During the course of this entire journey, the appellant and White Hawk each consumed about 7 or 8 beers; the decedent had 2 or 4 beers. They stopped again and the appellant demanded that he be allowed to drive the truck, under the belief that the decedent was driving too slow and was too drunk to be driving. These accusations triggered a quarrel between the appellant and decedent. Decedent got out of the truck and

began walking; refusing to ride with appellant because he was driving too fast. White Hawk and appellant drove a short distance up the road and waited for decedent, Geraldine. When she drew near, the appellant left the pickup and went back to talk to her. While the two were trying to settle their differences the appellant slapped her across the face. Testimony indicates that they then made up, settled their quarrel, and started hugging and kissing one another. They both got back in the pickup and White Hawk got out. The appellant and decedent then got into another fight and the decedent again left the truck and proceeded to walk down the road away from the vehicle.

White Hawk testified that as he was walking down the road he heard the pickup start and noticed it backing up toward the decedent. Decedent saw the truck coming toward her and started to run. White Hawk stated that she ran down into a ditch alongside the road but the pickup, spinning gravel and traveling at a fast rate of speed, followed her path and ran over her.

White Hawk, seeing the complete sequence of events, rushed over to see the consequences of the accidnt. He testified that he saw Geraldine lying on her back, with her body in front of the pickup. When he got to her she was conscious. She had dirt on her face, showed evidence of physical injury, and was uttering groaning sounds. The appellant was knocked unconscious for a short period of time from being tossed around in the cab of the truck as it plunged down the embankment. White Hawk realized that Geraldine had sustained serious injury and immediately ran to summon help.

He obtained the assistance of Joe Murphy. Murphy testified that when they returned to the scene of the accident they found the appellant leaning over the decedent, evidently trying to console her. White Hawk and Murphy forcefully removed Medicine Bull from the decedent's presence so they could render some help. Medicine Bull then attacked them, stating

that he was afraid they were going to hurt his "wife." During this period, Murphy testified that the decedent kept requesting them to—"Keep Freddy away from me, he is always hurting me."

When Officer Snodgrass arrived he arrested Medicine Bull on the grounds that he was intoxicated—he was glassy eyed, clumsy and had the smell of alcohol on his breath.

An ambulance was summoned and Geraldine was taken to Lame Deer, Montana where she was examined by doctors. Realizing the seriousness of her condition, they transferred her to St. Vincent's Hospital in Billings, Montana. She died 2 days later, on July 22, 1967.

The appellant in his brief denotes six issues.

These will be dealt with in the order they are raised.

First, the evidence is insufficient to support the verdict of involuntary manslaughter. In this regard he contends there is no concrete evidence proving that he was intoxicated, and arguendo, if he was intoxicated, his intoxication was not the proximate cause of the decedent's death.

While the appellant did not testify as to whether or not he had had anything to drink the afternoon in question, or if he did drink how much he had, we feel that there was sufficient testimony presented by other witnesses to present the issue to the jury for their consideration. State's witness Officer Snodgrass arrested Medicine Bull for being intoxicated, based on his observation of the appellant—glassy eyed, the smell of alcohol on his breath, and his physical appearance. Having made some 350 similar arrests, the jury could well believe his criteria for determining the sobriety of a person. Christopher White Hawk testified that the appellant had about seven or eight beers on the way back from Birney to the bridge. White Hawk also indicated that Medicine Bull had had some beer before they met at the bridge. On cross-examination he stated that the appellant was driving in a straight line and did not show any signs of weaving or wob-

bling. These two bits of testimony have to be weighed in light of the fact that White Hawk himself had had a considerable amount to drink. But, this too was to be determined by the jury. Joe Murphy, a Vista worker who was one of the first to arrive at the scene of the accident, testified that the appellant was unstable, could not walk very well, and was very clumsy.

All this testimony tends to show that the appellant was showing some outward signs of intoxication. Of course the jury heard evidence that Medicine Bull was knocked unconscious and this might have been the direct cause of his clumsy, awkward physical condition. We have consistently held that the factual issue of intoxication is to be determined by the jury. They are free to consider all the evidence presented; to pick and choose which of the witnesses they wish to believe. State v. Pankow, 134 Mont. 519, 333 P.2d 1017. Sufficient testimony was introduced to justify the jury's finding and this conclusion will not be disturbed unless there is a clear misunderstanding by the jury or misrepresentation made to the jury. State v. Bosch, 125 Mont. 566, 242 P.2d 477.

Assuming that the appellant was intoxicated, he alleges that the faulty mechanical condition of the pickup was the proximate cause of Geraldine Killsnight's death rather than his intoxication. This contention rests on the appellant's testimony and that of Alan J. Kruger, an auto technician and mechanic. Medicine Bull stated that as he started to back up he put the accelerator pedal to the floor and it stuck—causing him to lose control of the car. He did not attempt to use the clutch, brake, or shut off the ignition. He testified that he attempted to steer clear of the decedent, but with a defective front end and the speed of the vehicle he was unable to do so. Mr. Kruger examined the truck after it had been driven about two or three hundred miles after the accident, about one month later. He testified that he road tested the pickup and when he put the pedal to the floor it again

stuck; but it would not stick unless it was depressed completely down. He noted there were other mechanical abnormalities but that these were not discovered until a month after the accident.

The ability of the appellant to control the car once it began backing up was undoubtedly given great consideration by the jury. The diagram prepared in court shows that the car traveled approximately 91 feet on the road before it entered the gully and then rambled another 70 or more feet before it struck the decedent. This gave the appellant a minimum of 161 feet in which to stop, bring the car under control, or take other means to avoid hitting Geraldine. Again the propriety of his actions is another question within the domain of the jury.

In State v. Stoddard, 147 Mont. 402, 408, 412 P.2d 827, 831, we said: "First, we should note that this court is not a trier of fact, rather we are here for the purpose of determining whether a miscarriage of justice is shown. In so doing, we consider the evidence which the jury heard and the ultimate facts which they found, together with the rulings which the trial court made. In view of the presumption of innocence at the trial, the jury must have been instructed to that effect, but on appeal after conviction the rule changes. Then, if the record shows any substantial evidence to support the judgment, the presumption is in favor of such judgment. State v. Robinson, 109 Mont. 322, 96 P.2d 265; State v. Cor., 144 Mont. 323, 396 P.2d 86."

Second, appellant alleges that the jury was improperly instructed on the definition of involuntary manslaughter. The following instruction was read by the court to the jury: "Manslaughter is the unlawful killing of a human being without malice. One kind of manslaughter, the definition of which is pertinent in this case, is involuntary manslaughter, being that which is done in the commission of an unlawful act, not amounting to a felony or which is done in the commission

of a lawful act which might produce death, in an unlawful manner, or without due caution or circumspection." This instruction is taken from section 94-2507, R.C.M.1947.

Appellant contends that since he is a juvenile he can only be prosecuted as an adult for those acts specified in section 10-602, R.C.M.1947. Subdivision (2) of this section provides: "The words 'delinquent child' include: * * * (b) A child who has violated any law of the state, provided, however, a child over the age of sixteen (16) years who commits or attempts to commit murder, manslaughter, * * * assault in the first degree, robbery, first or second degree burglary while having in his possession a deadly weapon, and carrying a deadly weapon or weapons with intent to assault, shall not be proceeded against as a juvenile delinquent but shall be prosecuted in the criminal courts in accordance with the provisions of the criminal laws of this state governing the offenses above listed. * * *" After setting forth other definitions of a "delinquent child" the statute says: "(f) A child who unlawfully, negligently, dangerously, or wilfully operates a motor vehicle on the highways of the state or on the roads and streets of any county or city so as to endanger life or property, and a child who operates a motor vehicle on such highways, roads or streets while intoxicated or under the influence of intoxicating liquor." Appellant's contention is that since he is a juvenile and a delinquent child, he can only be punished civilly for his acts and not criminally (State ex rel. Ostoj v. McClernan, 129 Mont. 160, 284 P.2d 252); therefore, the giving of the instruction concerning unlawful acts was erroneous, since there was no evidence of any unlawful act.

We cannot agree with appellant's allegation there was no evidence in the record showing that he had committed an unlawful act. Even though driving a vehicle in the manner as described in section 10-602, R.C.M.1947, may only subject the offender to punishment as a "delinquent child" it certainly

does not mean that he has not committed an unlawful act. This section specifies how the offender is to be prosecuted, not to classify his actions as lawful or unlawful. As stated in State v. Strobel, 130 Mont. 442, 304 P.2d 606, the driving of an automobile on a public highway while in an intoxicated condition is an unlawful act; hence, the giving of a similar instruction in a manslaughter case was approved.

■ We reaffirm the holding that driving a car on public roads or highways while in an intoxicated condition is an unlawful act; therefore it was entirely proper for the court to give the instruction defining manslaughter as: "* * * being that which is done in the commission of an unlawful act, not amounting to a felony * * *."

Third, appellant Bull asserts that the court erred in not giving his proposed instruction No. 41 on circumstantial evidence: "You are instructed that the evidence relied upon by the State of Montana to establish the defendant's guilt is known as circumstantial evidence.

"Where a conviction is sought upon such evidence, all of the circumstances proved must be consistent with each other and with the hypothesis that the accused is guilty, and at the same time inconsistent with any other rational hypothesis." It should be noted that not all the evidence offered was circumstantial; the fact the decedent was struck by the pickup driven by the appellant was proven by direct evidence. Two other instructions were given the jury which related to direct and circumstantial evidence.

Fourth, appellant maintains that it was error for the district court to permit State's exhibits lettered D, E. H, I, and J, all photographs of the scene of the accident, to be taken to the jury room. These exhibits were not originally taken to the jury room but were asked for by the jury about an hour after they began their deliberations. Over the appellant's objection, based on section 93-5104, R.C.M.1947, the judge allowed the exhibits to be taken to the jury room.

These photographs taken some five months after the accident show that the ditch had a weed growth covered by snow. Appellant contends these pictures distort the actual dimensions and landscape of the embankment and gully and that at the time they were offered and admitted into evidence the trial judge gave the following admonition: ''I shall caution the jury when they view these photographs to realize that they are not purporting to be of the same conditions as of the time of the accident but only that they are pictures of the area.'' Appellant further argues that the jury was not given this same admonition when the pictures were submitted to them during their consideration of the case and as a result received the impression that the ditch was very shallow.

Before we can answer the preceding question we must determine if it was proper to submit the photographs to the jury in the first place. Section 94-7303, R.C.M.1947, provides: "Upon retiring for deliberation, the jury may take with them all papers (excepting depositions) which have been received as evidence in the cause, or copies of such public records or private documents given in evidence as ought not, in the opinion of the court, to be taken from the person having them in possession. They may also take with them the written instructions and notes of the testimony or other proceedings on the trial, taken by themselves, or any of them, but none taken by any other person." While it has been the practice in Montana for trial courts to include photographs in the term "all papers" as used by the Statute, such practice has not as yet been approved by this Court. Section 94-7303, R.C.M.1947, was adopted from the California Penal Code in 1895. California has ruled as early as 1914 in People v. Balestieri, 23 Cal.App. 708, 139 P. 821, and as late as 1960 in People v. Williams, 187 Cal.App.2d 355, 9 Cal-Rptr. 722, that photographs rightfully admitted into evidence can be properly sent to the jury during their deliberations. We accept the phrase "all papers".

44

State's exhibits D, E, H, I, J, show the scene of the accident but the area is covered by snow which could mislead. the jury in their analysis of. the topography. Exhibit I pictures a police car down in the ditch—we feel this gives an accurate appraisal of the actual depth of the trench. Exhibit J portrays a man holding a measuring stick which clearly indicates the exact depth of the gully. Regardless of the fact that there was snow present, we feel that when the jury studied the State's exhibits and the defendant's exhibits numbered 7, 8, 9, 10, which were taken shortly after the accident, and compared them, there could be little confusion about the embankment's true dimensions. Therefore the admission of the photographs was proper.

Fifth, appellant maintains that the lower court errer in allowing Joe Murphy to testify as to what the decedent said to him about twenty to thirty minutes after the accident:

"Q. Now, at that time and at that place did Geraldine make any statement to you? A. Yes.

"Q. What did she say? A. She told me to keep Freddie away from her because he was always hurting her and she repeated this two or three times to me."

Appellant contends that the statement was irrelevant heresay. While there is some question from the record of this case as to whether or not the appellant could have heard the decedent's statements, for our purposes here we will assume it was hearsay and the question now arises as to whether or not it comes within the "res gestae" exception.

As noted before, the decedent was in severe pain and emotionally upset. In fact, the death certificate states that the immediate cause of death was acute bacteremia and shock. The law in Montana concerning the "res gestae" exception was first set out in Sullivan v. Metropolitan Life Ins. Co., 96 Mont. 254, 29 P.2d 1046. There the court held that if the circumstances show the statements were made while the excitement produced by the incident still dominated the mind and

was a producing cause, they are part of the main event and competent regardless of the span of time that had elapsed between the accident and the statement. The lapse of time is important but not controlling. Each case has to be decided on its own particular facts to determine if it satisfies the hearsay exception. Here the decedent was in great pain, worrying if she was going to die, if she was going to lose her baby, and wanted the Catholic priest who was present to explain to her her fate in relation to death and God. Appellant admits his great love for this woman so it seems very improbable, if not impossible, that she could ever concoct a story under these circumstances intending to unjustly blame the appellant for a supposed intentional act. Her statement was not made as a response to any question. The time gap must be considered, up to thirty minutes, but the major factor is the surrounding circumstances and the decedent's state of mind. As said in Sullivan, supra, the solution of the question of admissibility of the evidence must in every case be left largely to the sound legal discretion of the trial court, subject to review only in case of manifest abuse. We find no such abuse or prejudice here and as a matter of law the statement was properly admitted.

Sixth, appellant alleges the State failed to prove the cause of death beyond a reasonable doubt. No evidence was introduced to show cause of death or the nature of the injuries sustained except the death certificate which showed the fact of death and purported causes. It is sufficient to say that the proximate cause of death is to be determined by the jury in the absence of any medical testimony.

It should be noted that in addition to the death certificate the State introduced evidence from the decedent's mother, Mary Teeth, that she was with her daughter at St. Vincent's Hospital when she died. There was no other evidence introduced indicating that the decedent was of ill health or suffered a disability. Direct evidence was offered showing that

the decedent was struck and injured by the pickup driven by the appellant, and died two days later. Nothing was introduced which could raise a doubt in the jury's mind that the proximate cause of death was anything but her impact with the truck.

The judgment is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES HASWELL, ADAIR and CASTLES concur.