THE STATE OF MONTANA, PLAINTIFF AND RESPONDENT, *v.*
NORMAN B. DUNCAN, DEFENDANT AND APPELLANT.

No. 14141.
Submitted Jan. 30, 1979.
Decided April 19, 1979.
Rehearing Denied May 16, 1979.
593 P.2d 1026.

Berg, Angel, Andriolo & Morgan, Bozeman, Richard J. Andriolo appeared, Bozeman, Pickard & Singleton, Sante Fe, N.M., Lynn Pickard argued, Sante Fe., N.M., Marchiondo & Berry, Albuquerque, N.M., for defendant and appellant.

Mike Greely, Atty. Gen., Helena, Charles E. Erdmann appeared, Asst. Atty. Gen., Helena, Donald E. White, County Atty., argued, Bozeman, Thomas J. Beers, Deputy County Atty., argued, Missoula, for plaintiff and respondent.

MR. JUSTICE SHEEHY delivered the opinion of the Court.

Defendant Norman Duncan appeals from his conviction following a nonjury trial in the District Court, Gallatin County, of deceptive practices and the sale of unregistered securities.

Defendant was president of Smart Pak, Inc., of Montana, which produced and marketed a dry granulated charcoal lighter (Smart Start) and a combination package of Smart Start and charcoal briquettes (Smart Pak). Smart Pak, Inc., was one of five corporations set up by defendant in different states to produce and market these products. The parent corporation was Survival Heat Products, Inc., of Idaho Falls.

In the fall of 1975 and spring of 1976, defendant discovered that automated packaging machines could not properly seal the special "child-proof" paper used to package his products. Thereafter, he and other company employees began selling "package seller agreements" in Gallatin County. The buyers of these contracts paid from $500 to $5000 to become package sealers for Smart Pak. The company supplied them with manual sealing machines and rolls of package paper depending on the amount paid by the seller.

After the sealers sealed the bags on three sides, they sold all properly sealed bags back to the company for 5 cents per bag.

The operation worked smoothly for a short time, but then, due to a series of mix-ups, the sealers did not receive their quota of bags to be sealed. These mix-ups, as asserted by defendant, included a paper shortage and errors in printing the bags.

In March 1976 Smart Pak came under investigation by both Federal Securities Exchange Commission and the State Auditor's Office in which securities sold in Montana are to be registered. At the point, the focus of these investigations concerned only whether the package sealer agreements were in fact investment contracts which defendant had failed to register.

Although neither agency told defendant to cease operations beyond ceasing to advertise and sell the questioned package sealer agreements, defendant did in fact close down his entire operation and refused to accept or pay for any sealed bags from the sealers or to send any more bags to be sealed. The reason defendant gave for his action was that the adverse publicity concerning the investigations had dried up the sales of these products.

In June 1976 defendant filed a receivership petition for Smart Pak. The sealers were thus left holding the "bags." After the initial few months, they did not receive payment for their work or recoupment of their investment.

On July 9, 1976, the State filed an information against defendant. The information consisted of four counts: Count I charged deceptive practices in violation of section 94-6-307, R.C.M.1947, now section 45-6-317 MCA; Count II charged fraudulent securities practices in violation of section 15-2005(1), R.C.M.1947, now section 30-10-301 MCA; Count III charged failure to register securities violation of section 15-2007, R.C.M.1947, now section 30-10-202 MCA; and Count IV charged issuing a bad check in violation of section 94-6-309(1), R.C.M.1947, now section 45-6-316 MCA. Defendant filed a motion to dimiss the information. On February 22, 1977, the court dismissed Count IV and defendant pleaded "not guilty" to the remaining three counts. On

that same day, defendant signed a written waiver of his right to trial by jury.

The case then came on for a hearing, on February 23, 1977, to the court sitting without a jury. On April 4, 1977, the District Court, in open court, found defendant guilty of Counts I and III. The court dismissed Count II. On May 6, 1977, the court entered written findings of fact and imposed sentence of five years imprisonment on Count I and three years imprisonment on Count III, the sentences to run concurrently. Defendant, thereafter, brings this appeal.

Additional facts are discussed as they become pertinent.

The issues presented for our consideration are:

1. Whether the evidence is sufficient to sustain defendant's conviction of deceptive practices?

2. Whether the Smart Pak Sealer Agreements are "securities" within the meaning of section 15-2007 to sustain defendant's conviction of failing to register such "securities"?

3. Whether defendant voluntarily, knowingly and intelligently waived his right to a jury trial?

4. Whether alleged references to defendant's bankruptcy proceedings in his criminal trial constitutes grounds for reversal of his convictions?

5. Whether defendant was properly charged and convicted of deceptive practices?

6. Whether the failure of the District Court to state in its findings that defendant had been proven guilty beyond a reasonable doubt or that he purposely and knowingly committed deceptive practices is sufficient grounds for reversal?

Before procceding to a discussion of the enumerated issues, this Court must dispose of a preliminary issue raised by defendant concerning the proper scope of review of a criminal bench trial. Defendant urges us to apply a broader standard of review than that normally applied in criminal appeals from jury trials.

We set forth the proper standard of review in criminal

bench trials in *State v. Longacre* (1975), 168 Mont. 311, 313, 542 P.2d 1221, 1222:

"It is the function of the trier of the facts, in this case the trial judge, to determine the credibility of the witnesses and the weight to be given their testimony and he may pick and choose which of the witnesses are to be believed from a consideration of all the evidence. *State v. Medicine Bull, Jr.*, 152 Mont. 34, 445 P.2d 916. On appeal we simply determine if there is substantial evidence to support the defendant's guilt beyond a reasonable doubt. *State v. Stoddard*, 147 Mont. 402, 412 P.2d 827; *State v. White*, 146 Mont. 226, 405 P.2d 761."

■ Thus the substantial evidence" test applies to appeals from both judge and jury convictions. Therefore, in determining whether there is substantial evidence to support the verdict entered by the trial court, this Court will examine the evidence in the light most favorable to the State. *State v. Pascgo* (1977), 173 Mont. 121, 566 P.2d 802, 805; *State v. Stoddard* (1966), 147 Mont. 402, 408, 412 P.2d 827, 831.

■ The determination of the proper standard of review relates most directly to defendant's first issue on appeal wherein he challenges the sufficiency of evidence to sustain his conviction of deceptive practices. We find sufficient evidence and therefore affirm his conviction on this count.

Defendant was convicted of violating section 94-6-307, R.C.M. 1947, now section 45-6-317 MCA. This Court has not construed this statute since its enactment in 1973. Defendant would have us apply the same elements to this statute as we found in its predecessor, "Obtaining money, property or services by false pretenses", section 94-1805, R.C.M. 1947. Under the former statute, we held it was necessary to prove four elements for a conviction:

". . . (1) The making by the accused to the person injured, of one or more representations of past events or existing facts; (2) that such injured party believed such representations to be true and, relying thereon, parted with money or property, which was received by the

accused; (3) that such representations were false; and(4) were made knowingly and designedly, with the intent to defraud such other person." *State v. Bartton* (1919), 56 Mont. 563, 566, 186 P. 327, 328.

The new statute clearly modifies the elements of proof necessary for conviction and for that reason that cases cited by defendant are inapplicable. Breaking the new statute down into its elements, we determine the State need prove only that:

(1) the defendant acted "purposely or knowingly" in

(2) making or directing another to make a false or deceptive statement

(3) addressed to the public or any person

(4) for the purpose of promoting or procuring the sale of property or service.

Gone are any requirements that the statements relate to past events or existing facts or that the injured party relied thereon in parting with money or property. In addition, "[s]ection 94-6-307 is designed to cover a greater variety of deceptive practices than were formerly proscribed by Montana law." Commission Comment, section 94-6-307, R.C.M. 1947. The legislative intent to expand the spectrum of criminal activities in the area of false pretenses previously punishable under Montana law is obvious. It is against these guidelines that we measure defendant's actions.

Initially we note that no real challenge is made by defendant to elements 1, 3, and 4 listed above. Defendant concedes he deliberately sought people to enter into these contracts at specified costs (elements 1 and 4) and that in so doing he caused to be broadcast and published various advertisements asking people to contact him or his employees (element 3). The only question concerns whether his statements to potential sealers were false or deceptive.

The State in its information alleged that defendant or defendant's employees acting at his direction repeatedly made five false statements with the purpose to induce persons to enter into the package sealer contracts at a cost of between $500 and $5000.

Proof beyond a reasonable doubt of any one of these five false statements is sufficient to sustain defendant's conviction.

The State alleged that in the package sealer contract itself defendant promised that 5 percent of each sealer's deposit was "to be held in trust for the purpose of guaranteeing repayment of deposit made by Package Sealer at the execution of this Agreement." The contract further stated that the trust fund was to be established at a specified bank in Bozeman.

The evidence presented at trial showed, however, that defendant made only nominal deposits to an escrow, not trust, account until the day before his meeting on March 30, 1976, with State and federal officials concerning possible securities registration violations. At this time, he suddenly deposited $15,000 to this account on advice of counsel. Thereafter, defendant withdrew virtually the entire amount between April 26 and May 6, 1976. Clearly, defendant had no intention of honoring his contractual promise regarding the 5 percent trust reserve.

The other allegations by the State were also supported by sufficient evidence. For example defendant told or implied by means of a prominent wall chart to those persons entering contracts that only 55 such contracts would be sold in the Bozeman area. In fact, 82 contracts were sold in Bozeman and approximately 275 were sold throughout Montana.

Defendant guaranteed each sealer a set quota of bags and a regular income depending on the amount of deposit. Yet as early as January 1976 many sealers were receiving less than their guaranteed quota of bags. Later the coporation office refused to accept or pay for sealed bags from the sealers. Indeed, as defendant himself testified, he needed monthly income of approximately $360,000 to buy the unsealed bags from the supplier and to pay his sealers for sealing them, without taking into account any other expenses or profits. When this figure is compared to the actual monthly income from sales of the products of $2,700, one is compelled to conclude that defendant knew his contractual promises would fail at the time they were made.

As a final example, defendant repeatedly represented that he had secured large contracts for the purchase of his products with Safeway Stores and the Coleman Company, among others. In fact, Safeway had agreed to only a trial contract and the Coleman Company formally demanded that defendant cease misrepresenting the existence of *any* contracts between them.

In sum defendant sold $417,000 worth of package sealer contracts on behalf of his company which had capital stock of only $3,100 and total income from product sales of only $13,500 over five months. The financial obligation under these contracts exceeded $500,000 per month. The inescapable conclusion is that defendant deliberately made false statements to induce others to enter these contracts. His conviction on this count is affirmed.

Defendant's second issue on appeal concerns his conviction of sale of unregistered securities. Defendant was charged and convicted of violating sections 15-2007 and 15-2021 of the Securities Act of Montana, now section 30-10-202 and 30-10-306 MCA. The security which defendant allegedly sold was the package-sealer contract. The trial court found that the contracts were investment contracts under Montana law and therefore subject to registration requirements. We affirm.

Montana has adopted the Uniform Securities Act, see Note, section 15-2001, R.C.M. 1947, now section 2-15-1901 MCA, which in turn relies for its definition of "security" on the Federal Securities Act. Section 401 (1), Uniform Securities Act, Commissioner's Note, 7A U.L.A. 631 (1978). As Montana has had no cases construing this statute, both federal cases and cases from other states adopting the Uniform Act are helpful in the determination of what is a "security."

The leading case for determining the existence of an investment contract security is *S.E.C. v. W.J. Howey Co.* (1946), 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244, in which the United States Supreme Court was concerned with the nature of an investment contract under the Securities Act of 1933, 15 U.S.C. § 77b(1) (1970). In that case, the Supreme Court stated:

"In other words, an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . ." 328 U.S. at 298-99, 66 S.Ct. at 1103, 90 L.Ed. at 1249.

Thus, the Supreme Court established three criteria to the determination of an investment contract security: an investment, a common enterprise, and the expectation of profits *solely* from the efforts of others.

Defendant's sealer agreements clearly meet the first two criteria. The sealers were required to invest (deposit) a certain amount of money upon signing the contracts. Although according to the terms of the contract, the sealers were to be paid regardless of sales, in actual fact, as defendant conceded at trial, without any sales of the product the sealers would not be paid. Thus, the income to the sealers depended upon the common enterprise selling the final product.

The third *Howey* requirement of expectation of profits *solely* from the efforts of others is not so easily met. It is undeniable that the sealers performed some function in the corporate enterprise, that of sealing three sides of the bags in their homes. It is also undeniable that the profits realized by the sealers depended in part upon the number of bags each sealed. The number of bags each was entitled to receive for sealing depended, however, exclusively upon the amount of their original deposit or investment. Further, the sealers had no voice or part in the actual sale of the final product. To the extent any profit from such sales inured to the corporation and then to the sealers, it resulted solely from the efforts of others. Thus, while it cannot be said that each sealer's expectation of profits depended solely on the efforts of others, to a large extent this was the case.

In any event, the rigid "solely" requirement of *Howey* has come under criticism as being inconsistent with the remedial goals of the Securities Act. As stated in *Howey* itself, the Securities Act:

". . . embodies a flexible rather than a static principle, one that is

capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." 328 U.S. at 299, 66 S.Ct. at 1103, 90 L.Ed. at 1250.

In 1971 the S.E.C. issued an interpretation of the Securities Act which is particularly applicable to the current situation:

"It must be emphasized that the assignment of nominal or limited responsibilities to the participant does not negative the existence of an investment contract . . ." S.E.C. Securitites Act Release No. 5211 (Nov. 30, 1971).

Accord, *S.E.C. v. Glenn W. Turner Enterprises, Inc.* (9th Cir. 1973), 474 F.2d 476, 482, cert. denied 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53; *S.E.C. v. Koscott Interplanetary, Inc.* (5th Cir. 1974), 497 F.2d 473, 480-81. In its discussion of the *Howey* test, the Fifth Circuit Court stated:

"[I]t is apparent that neither Congress, in fashioning a definition of an investment contract nor the Court in interpolating this defini-tion, could have relied upon crystallized authority endorsing a lit-mus formula. *This observation militates against the conclusion that the test was intended to exclude from the definition of invest-ment contract, any scheme where an investor contributed a nominal menial effort.*" 497 F.2d at 480-81. (Emphasis added.)

■ The United States Supreme Court, apparently realizing that its earlier pronouncement may have been too rigid, refined the *Howey* test in *United Housing Foundation, Inc. v. Forman* (1975), 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621:

"The touchstone [of an investment contract] is the presence of an investment in a common venture premised on a reasonable expec-tation of profits to be derived from the *entrepreneurial or managerial efforts of others.*" 421 U.S. at 852, 95 S.Ct. at 2060, 44 L.Ed.2d at 632. (Emphasis added.)

This language effectively deletes the strict "solely" requirement from the test.

Under the *Forman* test, the sealer contracts, with their promise

of profits to come from the entrepreneurial efforts of defendant and his employees, are clearly classifiable as investment contract securities and therefore subject to the security regulation statutes. The remedial purposes for which securities laws have been enacted require the adoption of this broad, flexible definition of "security".

While there are other tests for investment contract securities (e.g., "risk capital" test as applied in *Silver Hills Country Club v. Sobieski* (1961), 55 Cal.2d 811, 13 Cal. Rptr. 186, 361 P.2d 906), the *Forman* test quoted above is favored by the United States Supreme Court and many other state courts, and we adopt it for use in Montana.

Defendant argues that the application of this broadened definition of "security" to him is unconstitutional in that to do so is similar to the operation of an *ex post facto* law. We disagree.

As explained above, the definition we have adopted has essentially been used by the United States Supreme Court since 1946, *Howey*, supra, and has been adopted in several other jurisdictions. See e.g., Annot. 3 A.L.R.Fed. 592; *Searsy v. Commercial Trading Corp.* (Tex. 1977), 560 S.W.2d 637, 641; *Raymond Lee Organization, Inc. v. Division of Securities* (Colo. 1976), 556 P.2d 1209, 1211-12; *Pratt v. Kross* (1976), 276 Or. 483, 555 P.2d 765, 773. In fact, the definition was used in one federal case involving a Montana feedlot and bank. *Hector v. Wiens* (9th Cir. 1976), 533 F.2d 429, 433. As noted earlier, the Securities Act of Montana is a Uniform State Law and is traceable to the federal law. When as many jurisdictions have ruled on this matter as have prior to this case, defendant, who operates in several states, had clearly been placed on notice.

■ As we have stated, the Securities Act was enacted for remedial purposes and for that reason should be broadly construed. In *State v. Russell* (1972), 119 N.J.Super. 344, 291 A.2d 583, 587, the court stated:

"The public sale of corporate securities is a sensitive, highly and peculiarly specialized field of activity to which the investing public is exposed and one in which the public is generally not well versed.

The potential for serious financial injury to the buying public mandates that all sellers of securities be charged with knowledge of and compliance with all rules and regulations governing such sales."

Our adoption of the broadened definition is in line with the vast weight of authority across the country. Duncan cannot avoid liability on the grounds that our decision is an unprecedented, unforeseeable expansion of a statutory term.

In other states, a newly broadened definition of "security" has been applied to the defendant in a criminal trial without offending the constitutional prohibition against *ex post facto* laws. E. g., *People v. Blair* (Colo.1978), 579 P.2d 1133; *State v. Hodge* (1969), 204 Kan. 98, 460 P.2d 596. We conclude that the application of this broadened definition of "security" to defendant is not an unconstitutional application of an *ex post facto* law.

The remaining issues raised by defendant may be answered briefly.

On the morning of trial, defendant moved orally for a waiver of jury trial and shortly thereafter executed a written waiver. Having decided to risk a bench trial, defendant now seeks to avoid the result of his decision by claiming that his waiver was not voluntary, intelligent or knowing.

Montana's statutes require only that written consent of the parties be entered to waive a jury trial. Section 95-1901(d), R.C.M.1947, now section 46-16-102 MCA. This statute was followed. We see no reason under these facts where defendant was represented throughout by competent counsel to impose additional requirements in this area. See *State v. McCartney* (1978), 179 Mont. 49, 585 P.2d 1321, 1325, (failure to execute a written waiver of jury trial did not render judge trial void). Defendant's waiver of jury trial is valid.

Defendant next complains that the references during the trial to his pending bankruptcy violated Section 7(a)(10) of the Federal Bankruptcy Act which prohibits the use of testimony given in bankruptcy proceedings in subsequent criminal trials. 11 U.S.C. § 25 (a)(10). While it is true that there were references during the

trial to the pending bankruptcy procedings by defendant's we fail to see any prejudice to defendant's substantial rights resulting therefrom. None of the State's case hinged on any testimony or any evidence derived from the testimony given by defendant at the first meeting of the creditors. From the transcript it is clear that the State did not solicit any testimony regarding the bankruptcy proceedings. Only after defendant himself had broached this subject in his case-in-chief did the State choose to cross-examine on this testimony. Indeed, throughout the trial, it was defendant who continually mentioned the bankruptcy. In such a case any claim of prejudice is unfounded.

Next defendant argues that he should have been charged under section 15-2005, R.C.M.1947, the specific fraudulent securities practices statute, rather than section 94-6-307, the general deceptive practices statute.

 While it is true that in civil cases that a more specific statute controls over an inconsistent general statute, "[t]his Court has previously declined to apply this rule of statutory construction to criminal prosecutions where defendant's conduct violated" two or more criminal statutes. *State v. Moore* (1977), 174 Mont. 292, 570 P.2d 580, 583. As this Court stated in *State v. Lagerquist* (1968), 152 Mont. 21, 30-31, 445 P.2d 910, 915:

"The fact that the legislature provides a course of action by more than one statute allows the state to choose either applicable law . . . 'The fact that there is an area in which two statutes overlap and prohibit the same act, as in this case, does not mean that the defendant can only be prosecuted under the statute providing for the lesser penalty.'

"It is a cardinal principle of construction that repeals by implication are not favored. When there are two acts upon the same subject the rule is to give effect to both if possible. The intention of the legislature to repeal must be clear and manifest. Reading the statutes in question here we find no such intention on the part of the legislature." (Citation omitted.)

 We have held that defendant's acts violated the deceptive

practices statute, section 94-6-307. The charge against him that these acts also violated the fraudulent securities practices statute, section 15-2005, was dismissed by the District Court. Cf. *State v. Davis* (1978), 176 Mont. 196, 577 P.2d 375, (both defendants convicted on both felony charges arising from same act). Under these circumstances, the defendant was properly charged and convicted.

The last issue presented by defendant for review concerns the failure of the District Court to make specific findings that defendant acted "purposely or knowingly" or that the findings were made based upon proof beyond a reasonable doubt.

■ Defendant has cited no authority in support of his argument, and we can find none. A district judge in a criminal bench trial is under no statutory duty to make the findings requested by defendant. Cf. section 95-2206.11, R.C.M.1947, now section 46-18-306 MCA (requiring written findings of fact in cases involving the imposition of the death penalty). In the case at bar, the district judge was merely obliged to enter a general verdict of innocence or guilt. The issue is without merit.

The judgment of the District Court convicting defendant of deceptive practices and of selling unregistered securities is affirmed.

MR. CHIEF JUSTICE HASWELL, and JUSTICES HARRISON, concur,

MR. JUSTICE DALY, concuring in part and dissenting in part:

I concur in the majority decision on Issue Nos. 1, 3, 4, 5, and 6. I further concur in the adoption of the broadened flexible definition of "investment contract" as that term is used in the Securities Act of Montana.

It is to the majority's application to defendant of his newly broadened definition, not before adopted in Montana, that I respectfully dissent.

It is true, as the majority states, that security regulation acts as remedial measures to protect the public have been liberally construed. However, although the majority cites two cases in which a

broadened definition of security had been newly developed and applied in a criminal case, it is undisputable that the vast majority of cases in which such a liberal construction has been adopted have been civil, not criminal, in nature including the two primary United States Supreme Court decisions, *Howey and Forman.* See also, *S. E. C. v. Koscott Interplanetary, Inc.* (5th Cir. 1974), 497 F.2d 473; *S. E. C. v. Glenn W. Turner Interprises, Inc.* (9th Cir. 1973), 474 F.2d 476; *State Commissioner of Securities v. Hawaii Market Center Inc.* (1971), 52 Haw. 642, 485 P.2d 105; *State ex rel. Healy v. Consumer Business System, Inc.* (1971), 5 Or.App. 19, 482 P.2d 549; *Silver Hills Country Club v. Sobieski* (1961), 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906.

In giving effect to the remedial goals of the Securities Act, however, we must not sacrifice basic concepts of constitutional criminal justice.

The most basic principle of criminal law at stake here is that persons must have notice from the State of those acts which the State will prosecute as crimes. *H. Earl Clack Co. v. Public Service Comm'n* (1933), 94 Mont. 488, 502, 22 P.2d 1056, 1059. Criminal statutes that are too vague or ambigious will be struck down as unconstitutional for failure to give persons of ordinary intelligence fair notice that their contemplated conduct is forbidden. *Papachristou v. City of Jacksonville* (1972), 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110, 115-16. Although the Supreme Court in *Papachristou* noted that "[i]n the field of regulatory statutes governing business activities, where the acts limited are in a narrow category, greater leeway is allowed," these statutes too must provide notice of forbidden conduct.

The evidence here indicates that the requisite fair notice to defendant that his sealer contract were securities and should have been registered cannot be found in the statutory definition of "security". Section 15-2004(11), R.C.M.1947. That the statute fails to give adequate notice that this definition is broad enough to cover defendant's scheme is further indicated by the reaction of Thomas Olsen, then Gallatin County Attorney, when defendant presented

his plans to him. At trial Olson frankly admitted that it did not occur to him that defendant's sealer contracts needed to be registered as securities. In fact defendant advertised these contracts over the radio and in the newspapers for several months and sold 82 of the contracts in the Bozeman area before securities investigators *from Helena* became involved in the matter. If the county attorney charged with enforcing the statute did not think the contracts wee securities, I fail to see how a nonattorney unfamiliar with the statute could be deemed to have sufficient notice that he *may* be engaged in a criminal activity.

I emphasize "may"because until this opinion, it was entirely unclear as to whether defendant's plan did in fact violate the Securities Act. "There can be no doubt that a deprivation of the right of fair warning can result not only from vague statutory language but also from an unforseeable and retroactive judicial expansion of narrow and precise statutory definition of "security". *Bouie v. City of Columbia* (1964), 378 U.S. 347, 352, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894, 899. Indeed, an unforeseeable judicial enlargement of a criminal statute operates precisely like an *ex post facto* law forbidden by both our federal and state constitutions. *Bouie*; U.S.Const. Art, I, § 10; Mont. Const. Art. II, § 31.

This is not to say that the Montana Securities Act or the statutory definition of "security" are unconstitutional *per se*. I would only hold that applying this broadened definition of "security" retroactively to defendant's activities is improper and violates his due process right of fair warning. The definition should be *prospective* in application only.

The Michigan Supreme Court addressed the same question presented here in *People v. Dempster* (1976), 396 Mich. 700, 242 N.W.2d 381 and concluded:

"Without a prior 'clarifying gloss' or a clear definition of the special kind of negotiable promissory note intended to be exempted under the statute, or perhaps some form of prior actual notice that the instruments are not of the type exempted from registration [e. g., cease and desist order or injunction], a conviction could not

stand for failure to register such a negotiable note." 242 N.W.2d at 389. (Footnote summarized in brackets.)

See also *State v. George* (1975), 50 Ohio App.2d 297, 362 N.E.2d 1223.

I would reverse defendant's conviction on this count.

MR. JUSTICE SHEA concurring in part with the dissent of DALY, J., and separately dissenting in part.

With the exception of the waiver of the jury trial issue, I concur in Justice Daly's dissent wherein he concludes that the law involved here, should have prospective application only.

I would reverse defendant's conviction because the jury trial waiver was not spread upon the record, as I believe it required under the United States Constitution, if not our own.

In my dissenting opinion in the case of *State v. McCartney* (1978), 179 Mont. 49, 585 P.2d 1321, 1326-28, I expressed my views as to the requirement of a waiver of a jury trial being spread upon the record. McCartney is distinguished from the present case only in that McCartney did not sign a written waiver of a jury trial, whereas here the defendant did sign one. But even a written signature indicating a waiver does not eliminate the need for independent judicial inquiry into the circumstances of signing the waiver, nor does it eliminate the requirement for the trial court to adequately inform the defendant of his constitutional rights. This was not done in this case, and I would reverse.