[No. 9353–3–I. Division One. April 20, 1981.]

CHRISTGARD, INC., ET AL, *Respondents,* v. ALVIN A. CHRISTENSEN, ET AL, *Appellants.*

*John R. Kramer,* for appellants.

*John T. Robson,* for respondents.

JAMES, C.J.—Defendant Alvin Christensen appeals a judgment in favor of plaintiff Earl Gardinier in his action alleging violations of The Securities Act of Washington, RCW 21.20. We affirm.

Christensen, an inventor who developed a portable sawmill which he claimed to be superior to other sawmills on the market, placed the following advertisement in the December 28, 1977, edition of the Tacoma News Tribune: "High profit sawmill manufacturing business, will consider selling 49% to one or more partners. Consider working or silent partners. A. A. Christensen . . ." Exhibit 1.

Earl Gardinier, a man inexperienced in business and not knowledgeable about portable sawmills, responded to the advertisement. The trial judge found "that he was looking for an investment to make for the benefit of his entire family," finding of fact No. 10, although he especially desired to establish his three sons in a business.

Christensen represented to Gardinier that

the [sawmill] could be constructed for a total cost of $1,500.00 and sold for $4,500.00.

. . . the market potential was unlimited and that for every machine he constructed there were several willing buyers.

. . . a bank has conducted a market survey and was willing to loan him $50,000 to $60,000 for the development of his manufacturing and sales capabilities.

Finding of fact No. 12. As a result of his conversation with Christensen, Gardinier agreed to pay $25,000 for a 49 percent interest in the business. Gardinier paid $21,000 in cash and gave his note for the balance.

The business was thereafter incorporated as Christgard, Inc., in January 1978. The 49 percent interest purchased by Earl Gardinier was divided equally among his three sons. Gardinier kept no ownership interest in the corporation.

Christgard's business performance fell short of the expectations created by Christensen's representations. No local bank had, in fact, conducted any market survey and the market was saturated with sawmills comparable to the one manufactured by Christgard. The parties built only three sawmills, none of which could be sold for $4,500.

In March 1978, Christensen agreed to transfer his interest in Christgard and its assets to Gardinier's sons. These assets included one partially completed sawmill, parts for another sawmill, and the corporate checking account which contained approximately $5,700. Gardinier's sons agreed to pay Christensen for loans made to the corporation, back wages, and "book value" of his stock, all totaling approximately $3,100. The Gardiniers did not continue the business, believing they could not succeed in a tight market without Christensen's expertise and ability.

In July 1978, Earl Gardinier, his sons, and Christgard sued Christensen under The Securities Act of Washington, RCW 21.20. The trial judge concluded the arrangement between Christensen and Earl Gardinier constituted an "investment contract," which is a "security" within the meaning of RCW 21.20.005(12). Earl Gardinier was awarded judgment for his cash investment ($21,000), less payments he received from Christgard's funds toward his attorney's fees ($1,500), plus reasonable attorney's fees incurred in the suit ($2,487), plus interest from date of purchase and taxable costs and fees. The judgment also canceled Earl Gardinier's $4,000 note for the balance of the purchase price.

Christensen's basic contention is that this transaction did not constitute an "investment contract." We do not agree.

In *McClellan v. Sundholm,* 89 Wn.2d 527, 531, 574 P.2d 371 (1978), an "investment contract" was defined as "an investment of money in a common enterprise, where the investor expects to reap profits from the efforts of the promoter or a third party". This definition is the so–called "*Howey* test" adopted by the United States Supreme Court in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 90 L. Ed. 1244, 66

S. Ct. 1100, 163 A.L.R. 1043 (1946), which requires three elements: "(1) an investment; (2) a common enterprise; and (3) an expectation of profits from the efforts of another." *Sauve v. K.C., Inc.,* 91 Wn.2d 698, 702, 591 P.2d 1207 (1979).[1]

Earl Gardinier paid Christensen $21,000 to acquire an interest in a profitable business as advertised by Christensen. This constitutes an "investment."

The "common enterprise" element of the *Howey* test is satisfied if there is an "interdependence of fortunes, a dependence by one party for his profit on the success of some other party in performing his part of the venture." *McClellan v. Sundholm, supra* at 532. Here, Earl Gardinier was "a completely unsophisticated investor in that he [had] never owned any business interest, [had] no business experience and had never seen a sawmill prior to the meeting with Alvin A. Christensen." Finding of fact No. 13. Christensen was "an inventive genious [*sic*] and possess[ed] skills necessary for the construction of machinery and . . . experienced in the small scale manufacturing and sale of his product" and was also "a gifted and persuasive salesman." Finding of fact No. 5. Under these circumstances, Gardinier would necessarily depend upon Christensen to design, manufacture, and market the portable sawmills, and Earl Gardinier so testified. Earl Gardinier could profit only if Christensen was as successful in designing, manufacturing, and marketing the sawmills as Christensen assured Gardinier he was. A "common enterprise" under the *Howey* rule thus existed. *McClellan v. Sundholm, supra; Sauve v.*

---

[1]The legislature has since broadened the definition of "security" to include the "risk capital" form of investment contract as defined and rejected in *Sauve v. K.C., Inc.,* 91 Wn.2d 698, 591 P.2d 1207 (1979):

"Security" means any . . . investment contract; *investment of money or other consideration in the risk capital of a venture with the expectation of some valuable benefit to the investor where the investor does not receive the right to exercise practical and actual control over the managerial decisions of the venture;* . . .

RCW 21.20.005(12). (Amended by Laws of 1979, 1st Ex. Sess., ch. 68, § 1(12), p. 1197, at 1199–1200, effective September 1, 1979. Amendment in italics.)

*K.C., Inc., supra.*

The trial judge found that Earl Gardinier "expected to obtain profits from the efforts of Alvin A. Christensen." Finding of fact No. 21. Christensen contends, however, that because Earl Gardinier did not acquire any ownership interest in Christgard "shares," Earl Gardinier's payment was a gift or loan to his sons and he had no "expectation of profit." We do not agree.

 The trial judge did find that Earl Gardinier "had no interest in the corporation." Finding of fact No. 17. The Gardinier sons and Christensen did provide that "the corporation shall issue 254 shares of its common stock to Alvin A. Christensen [and] 82 shares to [each Gardinier son] upon receipt of cash or promissory note in payment of $1.00 per share for the shares subscribed . . ." Exhibit 5 (Minutes of First Meeting of Incorporators and Directors of Christgard, Inc.). But no money was ever paid for these "shares," finding of fact No. 17, nor could a promissory note constitute payment for the shares. RCW 23A.08.160. This illusory allocation of shares between Christensen and the Gardinier sons cannot obscure the economic reality of this transaction: Earl Gardinier bought a 49 percent interest in the sawmill business in response to Christensen's advertisement and other representations. "In determining whether a given transaction constitutes a 'security' . . . form should be disregarded for substance, and the emphasis should be on economic reality." *Sauve v. K.C., Inc., supra* at 701; *Tcherepnin v. Knight,* 389 U.S. 332, 19 L. Ed. 2d 564, 88 S. Ct. 548 (1967). If an investment contract exists under *Howey,* it is "immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise." *SEC v. W.J. Howey Co., supra* at 299. The investor's "gift" of the financial benefit promised him to some third party does not preclude the conclusion that an investment contract exists. *See Scholarship Counselors, Inc. v. Waddle,* 507 S.W.2d 138 (Ky. 1974).

Earl Gardinier responded to an advertisement for a "high

profit" business. He testified that after listening to Christensen's presentation, "I was pretty well sold . . . and I was timidly trying to get an opening there where I might sell myself to him, being acceptable to becoming a partner or have my son become a partner." Concerning the first meeting between his sons and Christensen, Gardinier testified, "[A]t that time, we were sure that the business was going to go; just wanted to know how to put it together so we could start making this fantastic profit." Although Earl Gardinier stated that he was investing "on behalf of" his sons, he did not give them the money he invested: "I would never put out that much money in my three boys, knowing they were inexperienced, and say, 'Here, build some sawmills.'" Plainly, Earl Gardinier expected to make a profit.

Christensen contends that Earl Gardinier did not expect to make a profit "solely from the efforts of the promoter or a third party," *SEC v. W.J. Howey Co., supra* at page 299, because his sons were participants in the operation of the sawmill business.

■ The import of the quoted language in the *Howey* test has been subjected to considerable judicial scrutiny in recent years. The Ninth Circuit has recognized that the "solely" element of the *Howey* test, literally applied, could easily be avoided by requiring the investor to contribute some effort and as so applied, the test would be inconsistent with the remedial and protective purposes of federal securities legislation. *SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 482 (9th Cir.), *cert. denied,* 414 U.S. 821, 38 L. Ed. 2d 53, 94 S. Ct. 117 (1973). In *Turner,* at page 482, the court held:

> [T]he word "solely" should not be read as a strict or literal limitation on the definition of an investment contract, but rather must be construed realistically, so as to include within the definition those schemes which involve in substance, if not form, securities. . . .
>
> . . . Rather we adopt a more realistic test, whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial

efforts which affect the failure or success of the enterprise.

This rule was followed in *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 480 (5th Cir. 1974), where the court also noted:

> Nowhere in the [*Howey*] opinion does the Supreme Court characterize the nature of the "efforts" that would render a promotional scheme beyond the pale of the definition of an investment contract. Clearly the facts presented no issue of how to assess a scheme in which an investor performed mere perfunctory tasks.

In *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852, 44 L. Ed. 2d 621, 95 S. Ct. 2051 (1975), the Supreme Court recognized but expressed no opinion upon the Ninth Circuit's reading of *Howey*. The court, however, stated, "The touchstone [of an investment contract under *Howey*] is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." Several courts have viewed this language as reading out the "solely" element of the *Howey* test. *Pratt v. Kross*, 276 Or. 483, 555 P.2d 765 (1976); *State v. Duncan*, __ Mont. __, 593 P.2d 1026 (1979). Cases adopting the Ninth Circuit's "realistic" interpretation of the *Howey* standard include *Searsy v. Commercial Trading Corp.*, 560 S.W.2d 637 (Tex. 1977); *Miller v. Central Chinchilla Group, Inc.*, 494 F.2d 414 (8th Cir. 1974); *Pratt v. Kross, supra; State v. Duncan, supra; Scholarship Counselors, Inc. v. Waddle, supra; Goodman v. Epstein*, 582 F.2d 388, 408 n.59 (7th Cir. 1978); *Hentzner v. State*, 613 P.2d 821 (Alaska 1980); *Lino v. City Investing Co.*, 487 F.2d 689 (3d Cir. 1973) (adopting a similar rule).

This precise issue was raised in neither *McClellan v. Sundholm*, 89 Wn.2d 527, 574 P.2d 371 (1978), nor *Sauve v. K.C., Inc.*, 91 Wn.2d 698, 591 P.2d 1207 (1979). Nevertheless, our Supreme Court applied the Ninth Circuit's "realistic" test in *McClellan v. Sundholm, supra* at page 532, stating:

> The third element of an investment contract under the

federal definition, an expectation by the investor that profits will be gained from the efforts of some other party, is also present here. The efforts of the other must be "the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *SEC v. Glenn Turner Enterprises, Inc., supra* at 482.

We are satisfied that, under Washington law, an investor need not expect profits "solely" from the efforts of a promoter or third party, so long as the other's efforts are "'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.'" *McClellan v. Sundholm, supra* at 532; *SEC v. Glenn W. Turner Enterprises, Inc., supra* at 482.

Here, Christensen's production knowledge and skills, managerial expertise, and marketing experience were the "essential managerial efforts which affect the failure or success of the enterprise," and were the basis of Earl Gardinier's decision to invest $25,000 in the business. We, therefore, conclude that Christensen offered and sold an "investment contract" within the meaning of RCW 21.20-.005(12) in violation of RCW 21.20.140, which prohibits the offering or sale of unregistered securities.

■ We further conclude that representations by Christensen violated RCW 21.20.010(2). The trial judge plainly credited Earl Gardinier's testimony concerning statements allegedly made by Christensen in order to induce an investment by Gardinier. The determination of the credibility of witnesses is a matter within the sound discretion of the trial judge. *E.g., In re Marriage of Mahalingam,* 21 Wn. App. 228, 584 P.2d 971 (1978). Christensen's representation that "a bank had conducted a market survey and was willing to loan him $50,000 to $60,000 for the development of his manufacturing and sales capabilities" was found to be false. Finding of fact No. 12. This is an untrue statement of material fact.

We now consider the amount of damages awarded. RCW 21.20.430(1) provides:

> Any person, who offers or sells a security in violation of any provisions of RCW 21.20.010 or 21.20.140 through 21.20.230, is liable to the person buying the security from him or her, who may sue . . . to recover the consideration paid for the security, . . . less the amount of any income received on the security, upon the tender of the security, or for damages if he or she no longer owns the security.

Christensen contends that he transferred property to Christgard at the time he and the Gardinier sons terminated their business relationship and that allowing Earl Gardinier to recover his original investment amounts to a double recovery.

Earl Gardinier's recovery of his investment should be offset by any "income received on the security". RCW 21.20.430(1). The evidence shows that Christensen transferred certain assets to Christgard and Christgard assumed certain obligations to Christensen when the parties terminated their business relationship. Christensen filed no counterclaim against Christgard for amounts allegedly due him. The parties' briefs and testimony at trial entail numerous references to items wrongly kept by one party or due the other, and the parties also dispute the value of the assets transferred by Christensen to Christgard. Gardinier contended these assets, or at least the sawmills and parts, were essentially worthless. The trial judge entered no findings with respect to these issues.

The sole amount personally received by Earl Gardinier prior to the decision below was a $1,500 advance for his legal fees. The trial judge properly deducted this amount from the judgment. Gardinier's counsel stated at oral argument that Christgard has not been dissolved nor its assets liquidated. Had assets been distributed to Earl Gardinier in liquidation, Christensen would have been entitled to a further offset for their fair market value. Had assets been distributed to Gardinier's sons in liquidation, we might conclude that Earl Gardinier, the investor and purchaser of the underlying business interest, exercised control over them and made a gift to his sons, justifying a further offset.

28

But we will not reverse the trial judge's award of damages in view of the highly conflicting evidence of asset values (the only asset with apparently undisputed value was the corporate checking account alleged to contain approximately $5,700), the likelihood of further claims on these assets by Christensen arising from his agreement with the Gardinier sons, the possibility of offsets against those claims, and counsel's assurance that Christgard has not been dissolved nor its assets liquidated. There is no substantial and specific evidence that Earl Gardinier received more than $1,500 in income from Christgard. We find no error in the measure of damages awarded to Earl Gardinier.

The judgment is affirmed.

ANDERSEN and CORBETT, JJ., concur.

Reconsideration denied May 20, 1981.

Review denied by Supreme Court September 3, 1981.