**SECURITIES ADMINISTRATOR,
Plaintiff-Appellant,**

v.

**The COLLEGE ASSISTANCE PLAN (GUAM) INCORPORATED, Enrique A. Sobrepena, Jr., Rose Sobrepena, and Alexander Bernales, Defendants-Appellees.**

**Civ. No. 80–0222A.**

District Court of Guam,
Appellate Division.

Dec. 22, 1981.

In so deciding we hold that under the Guam Uniform Securities Act an investment contract is created whenever:

1. An offeree furnishes value to an offeror; and

2. a portion of the value is subjected to the risks of the enterprise; and

3. the furnishing of the value is induced by the offeror's promises or representations which give rise to a reasonable understanding that a valuable benefit of some kind, over and above the value, will accrue to the offeree as a result of the operation of the enterprise; and

4. the offeree does not receive the right to exercise practical and actual control over the managerial decisions of the enterprise.

## I. FACTS

The College Assistance Plan of Guam (CAP) incorporated in May 1979. The individual appellees are its directors. Pursuant to purposes identified in its corporate articles, CAP offers for public sale prepaid college tuition assistance plans. It did not register the plans as securities prior to selling them.

CAP's contract scholarship plans operate as follows. After remitting a lump sum or arranging for installment payments, the purchaser designates a beneficiary under eleven years of age. Once the beneficiary begins college, the plan pays for first semester tuition and subsequent standard college fees and services. The purchaser may transfer benefits from one beneficiary to another, but may not redeem payments or resell the right to future benefits.

Under a standard CAP agreement, CAP receives the first 40% of the purchaser's payments for administrative costs. The remaining 60% becomes a "scholarship reserve" to be placed in a trust account managed solely by CAP. CAP pools all purchaser contributions into a single fund. Although CAP apparently drafted a trust agreement, it never established a trust

Russell Wong, Asst. Atty. Gen., Government of Guam, Agana, Guam, for plaintiff-appellant.

Paul J. Rodgers, Ferenz, Williams, Gruskin & Ashton, Agana, Guam, for defendants-appellees.

Before DUENAS, LAURETA and CONTI, District Judges.

## OPINION

LAURETA, District Judge:

Plaintiff-Appellant Securities Administrator appeals the dismissal of its complaint to enjoin defendants' sale of educational funding plans. The issue is whether the plans are investment contracts subject to registration as securities under the Guam Uniform Securities Act. We conclude that they are. We reverse.

account. Instead it opened checking and savings accounts to which only it had access.

Although only 40% of the scholarship reserve's income actually accrues to the reserve, the CAP "trustee" possesses unlimited investment power. The purchaser may not participate in investment decisions. Any income realized by the reserve results solely from CAP's investment judgment and abilities.

On February 12, 1980, appellant Securities Administrator sued to enjoin further CAP activities and to place CAP in receivership. The court below granted a temporary restraining order against CAP on the same day. On August 12, 1980, the court dismissed for failure to state a claim. It held that CAP's educational funding plans are not investment contracts. On September 2, 1980, it entered judgment on its dismissal order.

## II. INVESTMENT CONTRACT TEST

The issue is whether CAP's plans are investment contracts subject to registration as securities under the Guam Uniform Securities Act.[1] The Act does not specifically define what an investment contract is.

Early securities acts included the general definitional term "investment contract" to ensure that regulatory coverage would reach unusual forms of investment. *See* L. Loss, Commentary on the Uniform Securities Act 106 (1976); Long, Partnership, Limited Partnership, and Joint Venture Interests as Securities 37 Mo.L.Rev. 581, 584 n.15 (1972). Courts have accordingly construed this elastic phrase broadly to effectuate the remedial purposes of securities legislation. Sales of cable television partnerships,[2] whiskey casks[3] and warehouse receipts,[4] rare coins,[5] animals,[6] and other items[7] have been found to be investment contracts.

Three judicially developed tests articulate standards for identifying investment contracts where, as here, the applicable legislation provides no guidance. The adoption of an investment contracts test is a matter of first impression which the Court must address in order to adjudicate this appeal.

---

1. Guam Government Code § 45101–45420. Section 45301 states in relevant part that "(i)t is unlawful for any person to offer or sell any security in this state unless (1) it is registered under the Act . . . ." Section 45401(1) defines a security as:

> . . . any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate or subscription; transferable share; *investment contract*; voting-trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such a title or lease; or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. "Security" does not include any insurance or endowment policy or annuity contract under which an insurance company promises to pay a fixed number of dollars either in a lump sum or periodically for life or some other specified period. (emphasis added)

Thirty-four other jurisdictions have adopted the Uniform Securities Act, 7A ULA 628 (1978). Eleven additional jurisdictions, including the Trust Territory of the Pacific Islands, have adopted one or more sections of the Act. L. Loss, *Commentary on the Uniform Securities Act* (2d ed. 1976) v, vi.

2. *SEC v. Murphy*, 626 F.2d 633, 640 (9th Cir. 1980).

3. *SEC v. Haffenden-Rimar International Inc.*, 496 F.2d 1192, 1193 (4th Cir. 1974) (per curiam).

4. *Glen-Arden Commodities v. Costantino*, 493 F.2d 1027, 1034 (2d Cir. 1974); *SEC v. M. A. Lundy Associates*, 362 F.Supp. 226, 238 (D.R.I. 1973).

5. *SEC v. Brigadoon Scotch Distributors Ltd.*, 388 F.Supp. 1288, 1293 (S.D.N.Y.1975).

6. *Smith v. Gross*, 604 F.2d 639, 643 (9th Cir. 1980) (per curiam); *Miller v. Central Chinchilla Group Inc.*, 494 F.2d 414, 417 (8th Cir. 1974); *Continental Marketing Corp. v. SEC*, 387 F.2d 466, 470–471 (10th Cir. 1967), *cert. denied* 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419 (1968).

7. *See generally* 3A L. Loss, Securities Regulation 488–496 (2d ed. 1961, Supp.1969).

The tests which the Court now reviews are the federal, risk capital, and Hawaii tests.

### a. The Federal Test

■ Under federal securities law, an investment contract is an investment (1) in a common venture premised on (2) a reasonable expectation of profits to be (3) derived solely from the entrepreneurial or managerial efforts of others. *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 558, 99 S.Ct. 790, 796, 58 L.Ed.2d 808 (1979); *United Housing Foundation Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621, *reh. denied* 423 U.S. 884, 96 S.Ct. 157, 46 L.Ed.2d 115 (1975); *SEC v. W. J. Howey Co.*, 328 U.S. 293, 298–299, 301, 66 S.Ct. 1100, 1102–1104, 90 L.Ed. 1244, *reh. denied* 329 U.S. 819, 67 S.Ct. 27, 91 L.Ed. 697 (1946).

In theory the federal test focuses upon economic realities by examining the substance rather than the form of a transaction. 439 U.S. at 558, 99 S.Ct. at 796; 421 U.S. at 851–852, 95 S.Ct. at 2060. In application the test has generated confusion and criticism for its failure to do so. We reject it for three reasons.

First, it is unclear under what circumstances this test recognizes non-cash value, such as services or goods, as consideration for a security. *International Brotherhood of Teamsters v. Daniel* illustrates this uncertainty. In *Daniel* the Supreme Court ruled that a compulsory, non-contributory employee pension plan was not an investment contract. 439 U.S. at 559, 99 S.Ct. at 796. The employer rather than the plaintiff employee made direct payments into the plan. The employee contended that he had invested in the plan by permitting part of his compensation to be diverted into the pension fund in exchange for his labor. Rejecting this argument, the *Daniel* court stated that "(o)nly in the most abstract

sense may it be said that an employee 'exchanges' some portion of his labor in return for these possible benefits." *Id.* at 560, 99 S.Ct. at 797. Yet, the court hedged that "this is not to say that a person's 'investment,' in order to meet the definition of an investment contract, must take the form of cash only, rather than of goods and services." *Id.* at 560 n.12, 99 S.Ct. at 797 n.12.

One may arguably reconcile these pronouncements.[8] Nonetheless, commentary has questioned whether *Daniel's* analysis of the consideration issue recognizes economic reality. *See* FitzGibbon, What Is a Security? A Redefinition Based on Eligibility to Participate in the Financial Markets, 64 Minn.L.Rev. 893, 905 (1980).

Second, the federal test does not clarify whether an investment contract exists when profits result substantially, but not solely, from the efforts of someone other than the investor. *Howey* originally framed the test to require that the efforts be solely those of others. 328 U.S. at 299, 301, 66 S.Ct. at 1103–1104. *Forman*[9] and *Daniel*[10] reiterated *Howey's* formulation, yet also discussed the "efforts" prong of the test while omitting the qualifying word "solely."

*Forman* created further doubt about the "solely" component of the test in its treatment of *SEC v. Glenn Turner Enterprises*, 474 F.2d 476 (9th Cir. 1973), *cert. denied* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). *Turner* held that "the word 'solely' should not be read as a strict or literal limitation on the definition of an investment contract, but rather must be construed realistically, so as to include within the definition those schemes which involve in substance, if not in form, securities." *Id.* at 482. *Forman* acknowledged this holding yet expressly refused to state whether it was correct. 421 U.S. at 852 n.16, 95 S.Ct. at 2060 n.16.

---

**8.** *Daniel* reasoned that no investment contract existed because the investment potential of the employee's pension, contrasted with his desire for a livelihood, bore an attenuated rather than a substantial relationship to his choice of employment. 439 U.S. at 560, 99 S.Ct. at 797. *Daniel* does not foreclose that the federal test may find an investment contract where the

record demonstrates that the pension's investment potential was a primary motivation for a worker's choice of employment.

**9.** 421 U.S. at 852, 95 S.Ct. at 2060.

**10.** *Compare* 439 U.S. at 558, 99 S.Ct. at 796 *with* 439 U.S. at 561, 99 S.Ct. at 797.

Since *Forman*, courts and commentators have debated whether the federal test has effectively if not explicitly adopted the *Turner* rationale.[11] *Forman's* non-committal avoidance of *Turner* counsels against prematurely so concluding. *Daniel's* retention of the word "solely" in its post-*Forman* statement of the test likewise underscores the lingering ambiguity.[12]

Third, the federal test reflects an unduly restrictive view of what constitutes "profits." Profits consist either of the increased value of invested capital or of money received for invested capital. 421 U.S. at 852, 95 S.Ct. at 2060. Cost savings are benefits which do not qualify as profits. *Id.* at 851, 855–857, 95 S.Ct. at 2060, 2062–2063.

This narrow definition has been criticized as economically unrealistic:

> (T)he Court must surprise knowledgeable economists with its proposition ... that profits cannot assume forms other than appreciation of capital or participation in earnings. All of the varieties of profit involved here accrue ... in the form of money saved rather than money earned. Not only would common sense teach that the two are the same, but a more sophisticated economic analysis also compels the conclusion that in a practical world there is no difference between the two forms of income ... Under a statute having as one of its "central purposes" to protect investors ... The Court errs in distinguishing among types of economic inducements which have no bearing on the motives of investors.

Construction of the statute in terms of economic reality is more faithful to its "central" purpose to protect investors. (citation and footnotes omitted)

> 421 U.S. at 863–864, 95 S.Ct. at 2066 (Brennan, Douglas, and White, dissenting).

*Accord,* 64 Minn.L.Rev. at 905–906; Note, Is a Limited Partnership Interest a "Security"? The Current State of the California and Federal Definitions Add a Legal Dimension to Economic Speculation, 16 Santa Clara L.Rev. 311, 330 (1976).

The considerations above demonstrate the serious weaknesses of the federal test. Because of those drawbacks we decline to adopt it.

### b. The Risk Capital Test

*Silver Hills Country Club v. Sobieski*, 55 Cal.2d 811, 13 Cal.Rptr. 186, 188–189, 361 P.2d 906, 908–909 (Cal.1961) established that under California law a security is a transaction in which a person acting upon a solicitation risks capital in order to obtain a benefit.[13]

The risk capital test has two major advantages when contrasted with the federal test. First, it does not define a "benefit" as narrowly as the federal test defines a "profit." The benefit need not be a material benefit. *Id.* The risk capital test rejects the concept of expected financial profit as determinative; it inquires whether people who risk capital expect a return in one form or another. *Id.* Second, the test abandons the "sole efforts of others" component which continues to haunt the federal test.

**11.** *See, e.g., Goodman v. Epstein*, 582 F.2d 388, 408 n. 59 (7th Cir. 1978), *cert. denied* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979); *State v. Duncan*, 593 P.2d 1026, 1032 (Mont.1980); *Pratt v. Kross*, 276 Or. 483, 555 P.2d 765, 772–773 (Or.1976); *Christgard Inc. v. Christensen*, 29 Wash.App. 18, 627 P.2d 136, 140–141 (Wash.App.1981); FitzGibbon, What Is a Security? A Redefinition Based on Eligibility to Participate in the Financial Markets, 64 Minn. L.Rev. 893, 900 and n. 24, 906 (1980); Long, State Securities Regulation, 32 Okla.L.Rev. 541, 572 (1972).

**12.** 439 U.S. at 558; 99 S.Ct. at 796. Discussion of the test in recent decisions demonstrates the divergent interpretations which *Forman* and *Daniel* permit. *Compare SEC v. National Executive Planners Inc.*, 503 F.Supp. 1066, 1071 (M.D.N.C.1980) and *Fulk v. Bagley*, 88 F.R.D. 153, 163 (M.D.N.C.1980) [citing or applying *Howey's* "solely" formulation] *with Williamson v. Tucker*, 632 F.2d 579, 593–594 (5th Cir. 1980) [characterizing *Forman* as having "liberalized" *Howey* ].

**13.** In California the test applies to all securities. In other jurisdictions it supplements the federal test as a means for identifying investment contracts only. *See Pratt v. Kross*, n. 11 *supra* 555 P.2d at 769–773; Note, Definition of a Security, A Review, 31 Mercer L.Rev. 333, 335–339 and n. 34 (1979).

*See State ex rel. Healy v. Consumer Business System Inc.,* 5 Or.App. 19, 482 P.2d 549, 555 (Or.App.1971). Thus it affords courts greater flexibility to assess the quality as well as the quantity of each party's efforts.

Nevertheless, there is a problem which constrains us from adopting the risk capital test. It is unsettled whether the test addresses only original "start-up" capitalization or whether it also extends to transactions connected with subsequent capitalization by existing enterprises such as CAP. At least one decision states that the risk capital test encompasses only original capitalization. *Jet Set Travel Club v. Commissioner,* 21 Or.App. 362, 535 P.2d 109, 112 (Or.App.1975). This limitation frustrates the purpose of securities regulation. *See* Long, State Securities Regulation, 32 Okla. L.Rev. 541, 576–577 (1979); Note, Regulation of the Franchise as a Security, 19 Journal of Public Law 105, 126 (1970); Note, Franchise Regulation Under the California Corporate Securities Law, 5 San Diego L.Rev. 140, 164–166 (1968). To meaningfully protect investors, a test should reach abusive practices in existing enterprises as well as in new ones.

### c. Hawaii Test

*State v. Hawaii Market Centers,* 52 Haw. 642, 485 P.2d 105, 109 (Haw.1971) determined that an investment contract under the Hawaii Uniform Securities Act [14] is present when:

1. An offeree furnishes initial value to an offeror; and

2. a portion of the initial value is subjected to the risks of the enterprise; and

3. the furnishing of the initial value is induced by the offeror's promises or representations which give rise to a reasonable understanding that a valuable benefit of some kind, over and above the initial value, will accrue to the offeree as a result of the operation of the enterprise; and

4. the offeree does not receive the right to exercise practical and actual control over the managerial decisions of the enterprise.[15]

The Hawaii test defines investment contracts with pragmatic economic realism. It expressly refers to the furnishing of "value." Thus it clearly contemplates the exchange of both non-cash consideration and money.[16] The test also incorporates the strongest features of the risk capital test and the *Turner* variant of the federal test. It broadly examines "benefits" rather than myopically focusing upon "profits." Moreover, its concern with practical and actual investment control recognizes the importance of weighing both the quality and the quantity of the parties' managerial efforts.

Citing these advantages, commentary has repeatedly praised the Hawaii test's clarity, comprehensiveness, and functionality. *See* Hannan and Thomas, The Importance of Economic Reality and Risk in Defining Federal Securities, 25 Hastings L.J. 219, 258 and n. 151 (1974); 37 Mo.L.Rev. at 604–605; 32 Okla.L.Rev. at 578; 16 Santa Clara L.Rev. at 332–334. Other states have reacted favorably to the test and one has apparently codified it.[17] "(I)t is arguable that the test will eventually replace (the federal test) as the leading test for investment contracts, at least at the state level." 32 Okla. L.Rev. at 578.

The Hawaii test fulfills the broad remedial objectives of the Guam Uniform Securities Act. Accordingly we adopt it with one modification. We refer to "value" rather than to *Hawaii Market Center's* phrase "ini-

---

14. The statute construed in *Hawaii Market Centers* was identical to Guam Government Code § 45401(1). *Compare* n. 1 *supra and State v. Hawaii Market Centers,* 52 Haw. 642, 485 P.2d 105, 106 n. 1 (1971).

15. The Hawaii Supreme Court derived this test from a commentator's analysis of securities transactions. *See* Coffey, The Economic Reali-

ties of a "Security": Is There a More Meaningful Formula?, 18 W.Res.L.Rev. 367, 377 (1967).

16. *Id.* at 380.

17. RCW 21.20.005(12), *cited in Christgard Inc. v. Christensen,* 29 Wash.App. 18, 627 P.2d 136, 139 n. 1 (Wash.App.1981).

tial value." The word "initial" is ambiguous, and leaves room for the argument that the Hawaii test regulates original capitalization but not subsequent capitalization by existing enterprises. *See id.* at 576. We do not believe that the Hawaii Supreme Court conceived the test so restrictively.[18] Its purpose, like ours, was to ensure that courts focus upon fundamental policy questions rather than upon narrow semantical technicalities. 485 P.2d at 108. Nonetheless, the term "initial value" has créated confusion. Therefore, we omit the word "initial" to clarify that the Guam Uniform Securities Act reaches transactions connected with either original or subsequent capitalization.

## III. DISCUSSION

We treat the ruling below as a grant of summary judgment notwithstanding its characterization as a dismissal under Superior Court Civil Procedure Rule 12(b)(6) for failure to state a claim. A 12(b)(6) dismissal does not adjudicate the merits; it determines only whether a complaint's averments properly state a cognizable claim. *Mullis v. Merrill Lynch, Pierce, Fenner and Smith,* 492 F.Supp. 1345, 1349 (D.Nev.1980). After assessing the exhibits annexed to the complaint, the lower court concluded that CAP does not market investment contracts. In practical effect that holding decided the merits. When a court bases an ostensible 12(b)(6) dismissal upon exhibits attached to a securities complaint, the order is properly considered as a grant of summary judgment. *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1254 (9th Cir. 1976); *see Amfac Mortgage Corp. v. Arizona Mall of Tempe,* 583 F.2d 426, 430 n. 5 (9th Cir. 1978) (dictum); 5 Wright & Miller, Federal Practice and Procedure § 1366 and n. 62, p. 677–678. The order is a summary judgment because the exhibits appended to the complaint lead the court to effectively if not expressly resolve the merits. *Milwaukee Typo., Etc. v. Newspapers, Inc.,* 639 F.2d 386, 391 and n. 4 (7th Cir. 1981).

The appellate review standard consists of two alternative tests. The court inquires whether there is a genuine material factual issue or whether the evidence, viewed most favorably to the non-moving party, entitles movant to judgment as a matter of law. *Smith v. Gross,* 604 F.2d 639, 641 (9th Cir. 1979) (per curiam); *Marx v. Computer Sciences Corp.,* 507 F.2d 485, 487 (9th Cir. 1974). The court may order summary judgment for the non-moving party where, as here, all material facts are presented and movant received a full and fair opportunity to challenge the complaint's allegations.[19] *E. C. Ernst v. General Motors Corp.,* 537 F.2d 105, 109 (5th Cir. 1976); *Morgan Guaranty Trust Co. of N. Y. v. Martin,* 466 F.2d 593, 599–600 (7th Cir. 1972) (per curiam). *See generally* 6 J. Moore, Federal Practice § 56.12 at 56–335—56–338 (1976); Note, Granting Summary Judgment to a Non-Moving Party, 42 Mont.L.Rev. 157, 160–161, 164 (1981).

CAP's educational funding plans amply satisfy the elements of the Guam investment contracts test. No material factual issues under the test remain. The Securities Administrator, not CAP, is entitled to judgment as a matter of law.

### a. Value Subjected to the Risks of the Enterprise

CAP's scholarship funding agreements clearly implicate the first two components of the test. The purchase price of a scholarship plan is value which the buyer provides. The buyer pays value in consideration for CAP's representation that its plan will pay the beneficiary's college expenses. Sixty percent of that value goes into CAP's scholarship reserve fund. CAP invests the fund and subjects it to risk. The soundness

---

**18.** As observed in n. 15 *supra,* the Hawaii Supreme Court derived its test from an article on securities regulation. The article clearly indicates that the term "initial value" refers only to the "initial" or "first" step of a transaction. *See* 17 W.Res.L.Rev. at 374 n. 38. "Initial value" was not intended to be a term of art denominating the "initial" capitalization of a new enterprise.

**19.** CAP itself recognizes that case authority supports summary judgment disposition. Appellees' Brief, 3. Furthermore, CAP has extensively argued the merits.

and productivity of CAP's investments affect its continuing vitality as an enterprise and determine whether purchasers realize their expected benefits. CAP's investment success is the "thread upon which everybody's beads (are) strung." *SEC v. Joiner Leasing Corp.*, 320 U.S. 344, 348, 64 S.Ct. 120, 122, 88 L.Ed. 88 (1943).

### b. Representation of a Valuable Return on the Investment

There is no question that CAP induces the purchase of its scholarship plans by representing that valuable benefits will result. CAP's advertisements spotlight the perennial inflation which plagues higher education. The advertisements urge the prompt purchase of a plan to ensure a future education for the buyer's intended beneficiary. The valuable benefits which CAP leads the buyer to expect are educational security for the beneficiary, parental relief from burdensome and unpredictable educational costs, and resultant peace of mind.[20] The purchaser benefits from money saved rather than from money earned. In the words of Justices Brennan, Douglas, and White, "sophisticated economic analysis" and "common sense teach that the two are the same." 421 U.S. at 863–864, 95 S.Ct. at 2066 (dissenting).

### c. Lack of Practical or Actual Managerial Control

CAP plan purchasers have no practical or actual control over the investment management of the scholarship reserve fund. Under the funding agreement CAP's "trustee" exercises complete and unfettered investment power. The "trustee" controls the fund through checking and savings accounts to which only CAP has access. From the moment of purchase the buyer has no authority over the investment or the operation of the scholarship reserve fund. The economic realities thus compel the conclusion that CAP plan purchasers are investors protected by the Guam Uniform Securities Act.

Accordingly we hold that CAP's scholarship funding agreements are investment contracts subject to registration as securities. Even under the more restrictive federal test, courts have previously found that educational funding schemes involve securities. *See SEC v. American Foundation for Advanced Education of Arkansas*, 222 F.Supp. 828, 831 (W.D.La.1963); *Scholarship Counselors Inc. v. Waddle*, 507 S.W.2d 138, 142 (Ky.App.1974). The minor factual differences between those cases and this one prove only that "most of the modern ... schemes are not new, but rather are nothing more than updated versions of similar schemes which were (previously) tried." 32 Okla.L.Rev. at 541 n.2. The policy considerations which guided the courts there speak with equal force here:

> (T)he universal desire of parents to secure the advantages of higher education for their children and to offset whenever possible the increasing cost of such education makes the application of the registration requirements of the Securities Act emphatically necessary here. While ... it may well be that ... (CAP is) actuated by a sincere desire to ... foster the education of the youth of ... (Guam), the opportunities for wrongdoing with such a broad and fertile field of prospective investors are unlimited.

> While the plan(s) ... may ultimately prove to be entirely feasible, the objects and purposes of the Securities Act ... to protect the investing public require compliance with ... (its) terms by these defendants.

222 F.Supp. at 831; 507 S.W.2d at 143.

The judgment is REVERSED AND REMANDED with instructions to enter judgment for the Securities Administrator.

---

**20.** CT 1, Exhibit D is a "fact sheet" exemplar which memorializes some of CAP's representations. The first sentence of Exhibit D portrays CAP as "an insured tuition funding scheme." It promises that when a college admits the beneficiary, "CAP (Guam) Inc. pays for the tuition fees and other fees ... irrespective of cost at that time." It exhorts parents to "(f)ind out how your child can be assured of a chance to choose a higher education. Think about ... (his or her) tomorrow, by subscribing to CAP today!"